COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Moon, Judge Coleman and Senior Judge Cole
Argued by Teleconference


COMMONWEALTH OF VIRGINIA
                                             OPINION BY
v.        Record No. 2387-96-4         JUDGE MARVIN F. COLE
                                          MARCH 27, 1997
STEVE THORNTON


          FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                Carleton Penn, Judge Designate

          Steven A. Witmer, Assistant Attorney General
          (James S. Gilmore, III, Attorney General;
          Marla G. Decker, Assistant Attorney General,
          on briefs), for appellant.

          James C. Love, IV (Love, Keilsgard &
          Associates, P.C.), for appellee.


     Steve Thornton was indicted for the possession of cocaine

with the intent to distribute it, the simultaneous possession of

cocaine and a firearm, and the possession of more than one-half

ounce but less than five pounds of marijuana.  The trial judge

granted in part Thornton's motion to suppress evidence seized

from his apartment, but denied the motion to suppress his

statement to the police.  The Commonwealth appealed pursuant to

Code § 19.2-398, and Thornton cross-appealed issues decided

adversely to him.  For the reasons that follow, we affirm in part

and reverse in part.

                              FACTS

     At about 5:00 p.m. on June 2, 1995, the Leesburg Volunteer

Fire Company received a call regarding a possible fire at the

Cavalier Arms Apartments.  When Peter Comanduras, a captain with

the fire company, arrived at the apartments, he met a person who said he had called 911 because he smelled smoke and heard a smoke detector sounding in the apartment next door to his own. Police officers also arrived at the scene and, in conjunction with the firefighters, knocked on the doors of apartments nearby in an effort to evacuate the building. Customarily, police officers in Leesburg respond with firefighters to the scene of a reported fire to facilitate traffic and crowd control.

Comanduras repeatedly knocked on the door of the apartment where the fire had been reported, but he received no response. He heard "what sounded like a smoke detector" inside the apartment. Comanduras directed Firefighter Rodey to the rear of the apartment to look through a ground floor window. Rodey reported that he could not see smoke or fire, but heard what sounded like "a smoke detector going" inside the apartment. Rodey removed the screen from an open window and entered the apartment through the window. He proceeded to the front door and admitted other firefighters to the apartment.

Upon entering the apartment, Comanduras saw a pager on a table near the door. The pager, which was emitting a loud beeping sound, was the source of the noise the firefighters had heard from outside the apartment. Stacked on the table was a large amount of cash with what appeared to be a small marijuana cigarette beside it. To his left in the living room Comanduras saw suspicious material in a bag on the coffee table. Rodey and

-2-

Firefighter Obaugh continued to check the rest of the apartment to determine if there was a fire which could have been smoldering and producing only very light smoke. Comanduras testified that, while Rodey and Obaugh were engaged in this activity, he stepped out of the apartment and asked the police officers to enter and secure the stack of money inside. Then, having found no one in the apartment and no evidence of a fire, the firefighters departed the scene, leaving the apartment and the money in the responsibility of the police officers.

Officer Jeffrey Hunt testified that he was present when Rodey entered the apartment through the window. Hunt then returned to the front door and entered the apartment with the firefighters and Officer Gerard Clarkson. Upon entry, the officers saw the stack of money. Hunt testified that a firefighter pointed out the item which appeared to be a marijuana cigarette to him and Clarkson. Hunt also saw on the living room coffee table a plastic bag containing a green leafy material he suspected was marijuana.

After the firefighters had left the apartment, Clarkson called his sergeant for assistance. Clarkson checked the apartment to verify that no one was present and for "officer's safety sake." Clarkson noticed a nine millimeter Glock handgun on the television in a bedroom. Beside the gun was a baggie containing a white substance which Clarkson suspected was cocaine.

In response to Clarkson's call, Sergeant Willie Potter arrived at the apartment several minutes later. Clarkson and Hunt showed Potter the suspected marijuana and cocaine, the cash, the pager, and the gun. Potter field tested the suspected drugs, and the results of the tests were positive for cocaine and marijuana. After conducting the field tests, Potter placed the suspected cocaine and marijuana, the cash, the pager, a package of rolling papers, and the gun in a bag, which he took with him to obtain a search warrant for the apartment.

In the affidavit for the search warrant, Potter described the circumstances under which the firefighters and police had entered the apartment and found the cash, gun, and suspected drugs. He also stated that he field tested the substances and obtained positive readings for both marijuana and cocaine. Potter later executed the search warrant he obtained at the apartment and seized, among other things, additional cocaine and marijuana, prescription drugs, and food stamps.

On June 7, 1995, before Thornton was charged with any crime arising from the items seized from the Cavalier Arms apartment, Thornton's attorney contacted Potter. The attorney advised Potter that he wished to be present during any communication between Potter and Thornton.

On June 14, 1995, Thornton himself called Potter, said he had decided to proceed without his attorney, and agreed to speak with the police. Later that day, Thornton appeared at the police

station with his father, and Potter and another officer spoke with them in the library of the police station. At the beginning of the interview, Potter explained that Thornton was not in custody and was free to leave at any time. Thornton said he understood and did not desire to have an attorney present. Potter advised Thornton of his constitutional rights, and he executed a written waiver of his rights. Thornton then admitted that he lived in the apartment the police had searched. He made incriminating statements regarding the drugs, money, gun, and other items found there.

The trial judge ruled that the firefighters' and police officers' entry to Thornton's apartment was lawful and that any contraband items in their plain view were admissible. However, the judge found that the officers were not entitled to field test the suspected drugs found on the premises. Because the affidavit for the search warrant referred to the results of the field tests, the search warrant was invalid and any items seized pursuant to the warrant were inadmissible. The judge refused to suppress Thornton's statement, finding that he was not in custody when he had made it.

### SEIZURE OF EVIDENCE IN "PLAIN VIEW"

"The theory of the plain view doctrine is that an individual has no reasonable expectation of privacy in items that are in plain view." Arnold v. Commonwealth, 17 Va. App. 313, 318, 437 S.E.2d 235, 238 (1993). "The plain-view doctrine is grounded on

the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." Illinois v. Andreas, 463 U.S. 765, 771 (1983). "[I]n order for a seizure to be permissible under the plain view doctrine, two requirements must be met: '(a) the officer must be lawfully in a position to view and seize the item, [and] (b) it must be immediately apparent to the officer that the item is evidence of a crime, contraband, or otherwise subject to seizure.'" Conway v. Commonwealth, 12 Va. App. 711, 718, 407 S.E.2d 310, 314 (1991) (en banc) (quoting Stokes v. Commonwealth, 4 Va. App. 207, 209, 355 S.E.2d 611, 612 (1987)). We address both these questions in the context of the facts at hand.

First, for the evidence seized by Potter without a warrant to have been admissible, Hunt and Clarkson must have been lawfully inside Thornton's apartment and in a position to observe the evidence. The Commonwealth bears a heavy burden to justify the warrantless entry into a residence, which is presumptively unreasonable and therefore contrary to the Fourth Amendment. See Reynolds v. Commonwealth, 9 Va. App. 430, 435-36, 388 S.E.2d 659, 663 (1990). However, because the trial judge found the entry reasonable, we view the evidence as to this issue "in a light most favorable to the Commonwealth, granting to it all inferences fairly deducible therefrom . . . ." Id. at 436, 388 S.E.2d at

-6-

663 (citing Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

In Reynolds, we stated that "[t]he concept of 'exigent circumstances' forms the basis of the recognized exceptions to the Fourth Amendment requirement that a warrant to search must be obtained prior to entry. Among the circumstances accepted as providing 'exigent circumstances' for a warrantless search are those where a true 'emergency' exists." Id. (citation omitted). "A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." Michigan v. Tyler, 436 U.S. 499, 509 (1978). Furthermore,

> [p]olice officers are not required to possess either the gift of prophecy or the infallible wisdom that comes with hindsight. Their conduct in making a warrantless search must be judged by the circumstances confronting the officers at the time they act. The reasonableness of a police officer's response in a given situation is a question of fact for the trial court and its ruling will not be disturbed on appeal absent clear and manifest error. The right of the police to enter and investigate in an emergency is inherent in the very nature of their duties as police officers. A warrantless search during an emergency situation is "justified, if not required, by the fact that 'the preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties [sic].'"

Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664 (citations

omitted).

The facts, as they appeared to the firefighters and police officers called to the reported fire, justified a conclusion that an emergency existed inside Thornton's apartment, thus justifying the warrantless entry. The neighbor who made the report met the firefighters and officers upon their arrival and advised that he had smelled smoke emanating from Thornton's apartment. Furthermore, as the firefighters and officers confirmed, a loud beeping noise which sounded like a smoke detector could be heard from within the apartment. No one responded to the door of the apartment as police officers tried to evacuate other residents of the building. Under these circumstances, the firefighters and police officers lawfully entered Thornton's apartment to determine if there was a fire and to protect the lives and property of the apartment building residents.

Next, we consider the second half of the "plain view" equation. "The 'immediately apparent' requirement equates to probable cause in the context of 'plain view.'" Commonwealth v. Ramey, 19 Va. App. 300, 304, 450 S.E.2d 775, 777 (1994) (citing Texas v. Brown, 460 U.S. 730, 741-42 (1983)). Once inside the apartment, Hunt and Clarkson, as well as the firefighters, observed what appeared to be a bag of marijuana, as well as a marijuana cigarette, a large amount of cash, and a beeper. These circumstances provided Hunt and Clarkson with probable cause to believe that marijuana was present in the apartment, and they

were entitled to seize it. "[T]he fact that the officers [later] chose to field test the substance does not indicate that they lacked probable cause to believe the [substance] was contraband. Testing for certainty's sake will not, by itself, undermine an otherwise valid probable cause determination." United States v. Buchanan, 70 F.3d 818, 826 n.5 (5th Cir. 1995), cert. denied, 116 S. Ct. 1340 (1996).

As a part of the same transaction involving the entry into the apartment and the observance of suspected drugs, Hunt and Clarkson, remaining in the apartment to secure the scene, called for the assistance of other police officers. While they waited, Clarkson entered the bedroom to ensure the officers' safety and confirm the firefighters' conclusion about the reported fire. In the bedroom Clarkson observed in plain view a firearm and suspected cocaine.

Once police officers have effectuated a lawful warrantless entry and observed contraband inside, if there is a "'substantial risk that evidence will be lost or destroyed,'" the officers "may conduct a limited security check in those areas where individuals [who might destroy the evidence] could hide." Crosby v. Commonwealth, 6 Va. App. 193, 201, 367 S.E.2d 730, 735 (1988). See also Hunter v. Commonwealth, 8 Va. App. 81, 378 S.E.2d 634 (1989). Clarkson did not exceed the scope of this authority in making the security check of the bedroom. See Hill v. Commonwealth, 18 Va. App. 1, 4, 441 S.E.2d 50, 51 (1994).

Therefore, the police officers also were entitled to seize from the bedroom the contraband found there in plain view.

FIELD TESTS OF THE SUSPECTED DRUGS

"[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" United States v. Jacobsen, 466 U.S. 109, 124 (1984). Thus, in determining whether the field tests of the suspected marijuana and cocaine were lawful, we "'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Id. at 125.

In upholding a police officer's field test of white powder contained in a package, the United States Supreme Court stated:

> The law enforcement interests justifying the procedure were substantial; the suspicious nature of the material made it virtually certain that the substance tested was in fact contraband. Conversely, because only a trace amount of material was involved, . . . and since the property had already been lawfully detained, the "seizure" could, at most, have only a de minimus impact on any protected property interest.

Id. at 125.

Prior to conducting the field tests in this case, the officers possessed the right to seize the substances they suspected were marijuana and cocaine. The property interest Thornton retained in the substances, if any, was outweighed by

-10-

the interests of the police in determining that the substances were, in fact, contraband. Thus, the field tests were not unreasonable and did not violate the Fourth Amendment. Because the field tests were lawful, Potter was permitted to include the results in the affidavit for the search warrant. The trial judge erred in ruling otherwise and in finding that items seized pursuant to the search warrant were inadmissible.

On cross-appeal, Thornton contends that his statement to the police on June 14 violated his Fifth Amendment rights.  Where an accused in a criminal case is subjected to custodial police interrogation, he first must be advised of his Fifth Amendment rights as defined in Miranda v. Arizona, 384 U.S. 436 (1966), for any statement he makes to be admissible in evidence.  Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. at 444.

Thornton contends that he asserted his Fifth Amendment right to counsel through his attorney on June 7, and that his future contact with the police in the absence of counsel violated his Fifth Amendment rights.  However, as we have noted,

> Edwards [v. Arizona, 451 U.S. 477 (1981),] held that when an accused, during a custodial interrogation, invokes the right to have counsel present, the police may not resume the interrogation until the individual re-initiates communications and waives his right to counsel.  The Edwards rule has not been expanded to include non-custodial demands for an attorney . . . .

Tipton v. Commonwealth, 18 Va. App. 832, 834, 447 S.E.2d 539, 540 (1994) (citation omitted).  The record contains no evidence that the police had even contacted Thornton before June 7, much less deprived Thornton of his freedom in any way.  Therefore, he was not in custody at that time and the purported assertion of

Thornton's right to counsel was ineffectual.  See id.

Nor does the record reveal that Thornton was in custody when he talked to the police on June 14.  "[T]he application of Miranda [is not] triggered 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'"  Pruett v. Commonwealth, 232 Va. 266, 271, 351 S.E.2d 1, 4 (1986) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  "The mere presence of an officer and the mere fact of an investigation does not invoke Miranda."  Jordan v. Commonwealth, 216 Va. 768, 772, 222 S.E.2d 573, 577 (1976).

Thornton called Potter on June 14 and expressed his interest in talking to the police.  Acting upon his own initiative, Thornton later presented himself at the police station.  He was accompanied by his father.  He was immediately advised that he was free to leave at any time and that he was not under arrest.  Appellant said he understood, and there was no evidence Thornton was deprived of his freedom thereafter.  Although Potter advised Thornton of his constitutional rights, he was not required to do so, and no perceived defect in that process rendered his statement inadmissible.  For these reasons, the trial judge did not err in denying the motion to suppress Thornton's statement.

Thornton further argues that the trial judge erroneously refused to permit him to introduce evidence in support of his motion to suppress his statement.  Code § 19.2-401 states that

"[t]he defendant shall have no independent right of appeal pursuant to § 19.2-398.  If the Commonwealth appeals, the defendant may cross appeal from any orders from which the Commonwealth may appeal, pursuant to § 19.2-398."  Code § 19.2-398 does not permit appeal of a trial judge's evidentiary rulings at a hearing on a motion to suppress.  See Code § 19.2-398.  Accordingly, this question is not an issue cognizable on cross-appeal pursuant to Code § 19.2-401, and we do not address it.

For the foregoing reasons, we affirm in part and reverse in part the trial judge's decision regarding the motion to suppress. We remand the case for further proceedings consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.
