COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Kelsey and McClanahan
Argued at Richmond, Virginia


LEROY LESLIE KELLY, JR.

                                  MEMORANDUM OPINION[*] BY

v.      Record No. 2777-03-2              JUDGE D. ARTHUR KELSEY
                                       MARCH 8, 2005

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
George F. Tidey, Judge

Steven D. Goodwin (Gregory R. Sheldon; Goodwin, Sutton &
DuVal, P.L.C., on brief), for appellant.

Stephen R. McCullough, Assistant Attorney General (Jerry W.
Kilgore, Attorney General, on brief), for appellee.


Leroy Leslie Kelly, Jr. challenges his conviction for cocaine possession, claiming the police

seized incriminating evidence from his home without a warrant. The officer seized the evidence,

however, only after its discovery by a firefighter responding to an emergency medical distress at the

home. Applying Jones v. Commonwealth, 29 Va. App. 363, 512 S.E.2d 165 (1999), we hold that

the trial court correctly denied the motion to suppress.

I.

On appeal from a denial of a suppression motion, we examine the evidence in the light

most favorable to the Commonwealth, giving it the benefit of all reasonable inferences. Medley

v. Commonwealth, 44 Va. App. 19, 24, 602 S.E.2d 411, 413 (2004) (*en banc*); Slayton v.

Commonwealth, 41 Va. App. 101, 103, 582 S.E.2d 448, 449 (2003).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Observing his son having what appeared to be a seizure, Leroy Kelly, Sr. placed a call requesting emergency medical assistance. Two teams of firefighters from the Henrico County Fire Department arrived at Kelly Sr.'s home. He escorted them to his son's bedroom. His son appeared agitated and looked like he had been in a fight. He had a "quarter size red mark" on his forehead, "blood rings" around both lips, and a "wet spot" in the groin area of his pants. The small room was in disarray. A table had been knocked over, scattering various items across the floor. Kelly was "circling" the area of the room near a bureau dresser.

One of the firefighters, Scott Henderlite, conducted a medical evaluation and concluded that "one of the possibilities that we came up with was a possible drug problem." With that in mind, Henderlite "began looking for needles" to address those concerns and to ensure the "medical safety" of both Kelly and the firefighters on the scene. "We just kind of looked around for anything in our vicinity that we may come in contact with," he explained. While looking for drug-related paraphernalia, Henderlite found a "glass tube" — later determined to be a "crack pipe" containing cocaine residue. It was found on the floor underneath the corner of Kelly's bed. Henderlite picked up the tube to examine it and then placed it back on the floor. After that, Henderlite testified, the police officers were "called to the scene."

Henderlite remained with Kelly and the glass tube until the police officers arrived. As soon as they arrived, he alerted the officers to the glass tube found during the search for drug-related paraphernalia. Officer K.L. Motley placed Kelly under arrest for possession and conducted a search incident to arrest. In the immediate vicinity, Motley found the crack pipe underneath the bed. A photo taken by the officer shows a glass tube, with both ends broken off, covered internally with burn marks and a white residue.

On top of the adjacent dresser, Motley found a tin can containing a rock of crack cocaine and a razor blade. Underneath the dresser, he found a second crack pipe along with items used

for cleaning out such pipes.  In one of the drawers of the dresser, Motley discovered a .380 caliber semi-automatic handgun and ammunition.

The officers escorted Kelly to the hospital and later charged him with possession of cocaine in violation of Code § 18.2-250.  At trial, Kelly moved to suppress all incriminating evidence given the absence of a warrant authorizing the police to enter his home or to search his bedroom.  The trial court held that, under the circumstances of this case, the police officer "can be there" and that there "wasn't anything wrong with the arrest."  The court denied the motion to suppress the drug-related evidence, but granted the motion as to the firearm.  Going into the dresser drawers, the court reasoned, went beyond the officers' search-incident-to-arrest authority.  On the merits, the court found Kelly guilty of possession of cocaine.

II.

Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* scrutiny, "we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'"  Slayton, 41 Va. App. at 105, 582 S.E.2d at 449-50 (citations omitted).  To prevail on appeal, "the defendant must show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error."  Id. at 105, 582 S.E.2d at 450 (citation omitted); see also Barkley v. Commonwealth, 39 Va. App. 682, 690, 576 S.E.2d 234, 238 (2003).

In this case, Kelly concedes that his father invited the firefighters into the home.  This consent satisfies the Fourth Amendment, particularly given the perceived emergency situation.  See generally 3 Wayne R. LaFave, Search & Seizure § 6.6(a), at 451-53 (4th ed. 2004).  Kelly objects, however, to the entry of the police officers into the home and their later seizure of the drugs and related paraphernalia from his bedroom.

To begin with, we agree with Kelly that the evidence did not show his father invited the *police* into the home. The police officers were "called to the scene" after the firefighters found the crack pipe underneath the corner of Kelly's bed. When the officers arrived, the firefighters alerted them to the crack pipe. It was then that Kelly was arrested and the remaining evidence discovered during a search incident to arrest.

The question presented by this case is whether the police made an illegal, warrantless entry into Kelly's home.[1] We answered this question in Jones: "After a fireman has observed evidence in plain view, he may summon a police officer, who may enter the residence and seize the evidence without first obtaining a warrant." Jones, 29 Va. App. at 370, 512 S.E.2d at 168 (citations omitted); see also Commonwealth v. Thornton, 24 Va. App. 478, 481-82, 486, 483 S.E.2d 487, 488-89, 491 (1997) (finding seizure lawful where firefighter "stepped out of the apartment and asked the police officers to enter and secure" money and drugs found inside). Both the reasoning and holding of Jones squares with the majority rule, described by Professor LaFave this way:

> If firemen, conducting a lawful warrantless inspection come upon evidence of crime, they may then make a warrantless seizure of that evidence. In addition, they may ask for police assistance in this regard, and the police who enter in response to the request do not need a warrant for the entry or seizure. "Once the privacy of the residence has been lawfully invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing."

5 LaFave, supra § 10.4(c), at 179 (quoting from State v. Bell, 737 P.2d 254, 257-58 (Wash. 1987)); see Jones, 29 Va. App. at 371, 512 S.E.2d at 168 (also citing Bell, 737 P.2d at 257-58).

---

[1] In Jones, we faced a similar question "whether it was objectively reasonable for a police officer assisting at the scene of an apartment fire to make a warrantless, non-consensual entry of a specific apartment in response to a firefighter's statement, 'I have something I want to show you.'" Jones, 29 Va. App. at 366, 512 S.E.2d at 166.

This follow-in-the-footsteps principle accepts that "where a lawful intrusion has already occurred, and a seizure by an official has validly taken place as a result of that intrusion, the invasion of privacy is not increased by an additional officer entering the residence." Jones, 29 Va. App. at 370, 512 S.E.2d at 168 (citing United States v. Green, 474 F.2d 1385, 1390 (5th Cir. 1973)).[2] "A warrant is not required in these circumstances because the defendant no longer has a reasonable expectation of privacy for that area of the apartment where one official validly on the premises has made the lawful discovery, and another is merely preserving the incriminating evidence." Id. at 371, 512 S.E.2d at 169. "The apparent conflict between the Constitution and common sense which the plain view doctrine has reconciled is the same misconception which we here seek to dispel." Id. at 371, 512 S.E.2d at 168-69. "Almost every court that has considered this issue has held that a warrant is not necessary because the accused no longer enjoyed a reasonable expectation of privacy in the area where one officer is lawfully present." Wengert v. Maryland, 771 A.2d 389, 399 n.7 (Md. 2001) (citing 16 cases, including Jones, 29 Va. App. at 370, 512 S.E.2d at 168).[3]

This doctrinal concession to "common sense," Jones, 29 Va. App. at 371, 512 S.E.2d at 168 (citation omitted), comes with two important limitations. First, police officers cannot make a warrantless entry simply because firefighters earlier did so. The officers can follow in the

---

[2] This principle has been accepted by the great majority of courts. See, e.g., United States v. Brand, 556 F.2d 1312, 1317 (5th Cir. 1977); United States v. Green, 474 F.2d 1385, 1390 (5th Cir. 1973); Idaho v. Bower, 21 P.3d 491, 496 (Id. 2001); Wengert v. Maryland, 771 A.2d 389, 399 (Md. 2001); State v. Eady, 733 A.2d 112, 120 (Conn. 1999); Mazen v. Seidel, 940 P.2d 923, 927 (Ariz. 1997); Commonwealth v. Person, 560 A.2d 761, 766 (Pa. Super. 1989). Its reception has not been unanimous, however. See, e.g., United States v. Hoffman, 607 F.2d 280, 283-84 (9th Cir. 1979).

[3] See also United States v. Jacobsen, 466 U.S. 109, 125 (1984) (holding that "since the property had already been lawfully detained, the 'seizure' could, at most, have only a *de minimis* impact on any protected property interest"); Illinois v. Andreas, 463 U.S. 765, 771 (1983) ("No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal.").

footsteps of the firefighters only if they, during the course of their duties, discover what appears to be (using probable cause certitude) illegal contraband. See Jones, 29 Va. App. at 369, 512 S.E.2d at 168 (applying footsteps doctrine only when an "incriminating object comes into view during the performance of the fireman's duty").

Second, because the police "step into the shoes" of the firefighters, 5 LaFave, supra at 179 (citation omitted), the officers are limited to only those areas the firefighters could go and only those times the firefighters could go there. If the officers breach these boundaries, they must have an independent justification for the *additional* intrusion — one not merely derivative of the firefighters. Id. Otherwise, the officers must limit themselves to the "footsteps" of the firefighters and cannot "exceed the scope of the firefighters' earlier intrusion." Jones, 29 Va. App. at 371-72, 512 S.E.2d at 169 (citation omitted); see also Wengert, 771 A.2d at 399 n.7 (recognizing that "the later officials must confine their intrusion to the scope of the original invasion unless a warrant or one of the exceptions to the warrant requirement justifies a more wide ranging search").[4]

Here, Kelly's father thought his son might be having a seizure and placed an emergency call requesting help. Local firefighters were the first responders. When they arrived, they

---

[4] Most of the cases applying the footsteps doctrine involve emergency first responders like firemen, Jones, 29 Va. App. at 370, 512 S.E.2d at 168; Bell, 737 P.2d at 257-58, or other types of "emergency medical personnel," Bower, 21 P.3d at 494. We do not address whether, if at all, the doctrine applies outside this context.

We also have no occasion in this case to reconsider Jones or to attempt to limit it to police officers who can justify their warrantless entry on emergency grounds. Neither at trial, in his appellate brief, nor at oral argument on appeal did Kelly challenge Jones or our interpretation of it. Nor did Kelly, either on brief or at oral argument, attempt to distinguish it in the manner asserted by the dissent. To be sure, Kelly's counsel conceded at oral argument that Jones would permit a police officer to make a warrantless entry if a firefighter summoned him after finding what he had probable cause to believe was contraband. "All the fireman has to say," counsel argued, "is that I believed it was probably contraband." For these reasons, Rule 5A:18, Rule 5A:20(e), and the interpanel accord doctrine together preclude us from considering any challenge to Jones.

- 6 -

entered the home and found a battered young man circling his disheveled bedroom. After assessing his medical condition, the firefighters concluded a "possible drug problem" explained Kelly's symptoms. For his safety and their own, the firefighters searched the immediate area for needles or other drug paraphernalia that might confirm or dispel their suspicions. While doing so, they found what appeared to be a crack pipe. One of the firefighters picked up the pipe, examined it, and put it back where he found it.[5]

At the moment of discovery, the firefighters were legally present in Kelly's bedroom. They needed no warrant to be there. The discovery of the crack pipe occurred during the course of their emergency response duties, only after their medical assessment led them to suspect Kelly's condition might be drug induced. They did not go beyond their charge or engage in a subterfuge to undertake some criminal investigation. After the police officers were called to the scene, the firefighters specifically alerted them to the "glass tube" crack pipe. The firefighters remained with Kelly in his bedroom.

Having followed in the firefighters' footsteps, Officer Motley had probable cause to arrest Kelly for cocaine possession. He likewise had the authority to search Kelly incident to his arrest. See Slayton, 41 Va. App. at 108, 582 S.E.2d at 451. It was that post-arrest search which resulted in the seizure of the second crack pipe, the crack rock, and the drug paraphernalia — all

---

[5] At oral argument on appeal, Kelly conceded he never argued in the trial court that "the firefighter, when he was testifying about the glass tube, should have said, 'glass tube, *i.e.* crack pipe.'" Nor did he assert this point in his appellate brief. For this reason, we agree with the Commonwealth that Kelly waived this argument under Rules 5A:18 and 5A:20(e). At any rate, we find no merit in Kelly's assertion (made during oral argument on appeal) that the trial judge inferred too much from Henderlite's testimony. Read in context, Henderlite's testimony — particularly when coupled with Officer Motley's testimony — fully supports the factual basis implicit in the trial court's holding that Officer Motley "can be there" after Henderlite's discovery of the glass tube. On appeal of a suppression motion, we "give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton, 41 Va. App. at 105, 582 S.E.2d at 449-50 (citations omitted); Jones, 29 Va. App. at 366, 512 S.E.2d at 166 (recognizing that we must give "due weight to inferences appearing to have been drawn by the trial court").

items within Kelly's reach in the close confines of his bedroom.  See Chimel v. California, 395 U.S. 752, 763 (1969) (holding that a search incident to arrest in a home may include the area within the arrestee's "immediate control").[6]

### III.

The trial court correctly denied Kelly's suppression motion.  As in Jones, the police officers merely "followed in the footsteps" of the firefighters and did not exceed the permissible scope of their intrusion.  Jones, 29 Va. App. at 371, 512 S.E.2d at 169.[7]  For this reason, neither Kelly's arrest nor the resulting search incident to that arrest violated the Fourth Amendment.

Affirmed.

---

[6] Whether the firearm should have been suppressed is not a question before us.  We thus offer no opinion on it.

[7] Neither party cited Jones to the trial judge.  But it is wrong to presume the judge did not understand the legal principles discussed in Jones.  "The judge is presumed to know the law and to apply it correctly in each case."  Crest v. Commonwealth, 40 Va. App. 165, 175 n.3, 578 S.E.2d 88, 91 n.3 (2003) (citation omitted); see also Breeden v. Commonwealth, 43 Va. App. 169, 188, 596 S.E.2d 563, 572 (2004).  Unless that presumption is rebutted, the very fact the trial judge ruled in favor of the Commonwealth necessarily implies that he decided all legally material factual disputes against the defendant.  It follows, then, that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution[.]'"  Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson v. Virginia, 443 U.S. 307, 326 (1979)).  At oral argument on appeal, Kelly's counsel stated that, even though no one cited Jones, the "underlying argument was similar" in the trial court.  Finding nothing to rebut the presumption, we see no reason to reverse the factual inferences to favor the defendant on appeal.

Benton, J., dissenting.

"[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (citation omitted). Although government agents who act in the absence of a search warrant may "'seek exemption from the constitutional mandate [by showing] that the exigencies of the situation make that course imperative,'" Chimel v. California, 395 U.S. 752, 761 (1969) (citation omitted), the principle is well established that "the general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show a need for it.'" Id. at 762 (citation omitted). The evidence in this case did not satisfy the Commonwealth's burden to show an exigency existed that justified the police officers' warrantless entry into Leroy Leslie Kelly's home. Therefore, I would hold that the evidence the officers seized and Kelly's arrest were the product of an illegal entry and search.

I.

The evidence proved that Scott Henderlite, a Henrico County fireman, went to Kelly's home in response to a "call[ ] for a possible patient having a seizure." When he arrived, three other firemen were already in a bedroom with Kelly. Kelly's father was in the hallway outside the bedroom. The fireman testified that when he entered the bedroom Kelly "was sitting in [a] chair and he would get up and circle this area, sit back down, get up and circle the area." He explained that Kelly "just seemed real agitated with the possible -- level of consciousness" and that his "concern was to try to calm [Kelly] and assess any kind of medical problems that he may have." The fireman testified that they measured Kelly's "vital signs" and found them to be within normal limits. He further testified as follows:

- 9 -

> After assessing the patient, we were trying to determine what was causing his condition, and one of the possibilities that we came up with was a possible drug problem. And after ascertaining that, we began looking for needles, mainly for out safety.

He found a glass tube under the bed, picked it up, and then put it back where he had found it.

No police officers were present when this occurred, and the record suggests that they had not earlier been requested to go to Kelly's residence. The fireman testified that after he saw the glass tube the Henrico police "eventually were . . . called to the scene." When two police officers arrived, the fireman alerted them to the glass tube.

Officer Motley was the first police officer to arrive. The record does not establish that anyone consented to his entry to the residence. When Motley entered the bedroom, Kelly was sitting and "being assessed by the [firemen]." He explained the following:

> When I initially got there, my initial conversation was I asked [Kelly] what was wrong. He said nothing was wrong. He said, "My father had called the fire department because I guess he thought I was sick." I asked him about the tube that was in plain view in the floor. He said he didn't know what that was, the fire guys had brought a lot of stuff in and they must have brought that in. He stated he had never used drugs before.

When Officer Trunk arrived, Officer Motley was already at the residence. Officer Trunk testified that he went to the bedroom and did not testify that anyone consented to his entry to the residence. He described the following events that occurred after he entered:

> [Kelly] was actually standing up and Officer Motley had to ask him for his ID. There was stuff that's all over the ground here, pencils, markers, some scissors, and he bent down and attempted to pick those up. Officer Motley said, "Don't worry about that. Just stand on up for me." Trying to interview [Kelly] more about what had happened and again he was just saying nothing happened, not much happened. And then he bent down again to pick up and retrieve all the stuff to kind of clean up the room, because there was stuff scattered all over the floor.

Officer Motley testified that he asked for Kelly's identification after "the fire guys had finished with their assessment." He gave no reason for asking Kelly for an identification document but does explain the following:

> At that point he stood up and he started bending down towards the floor. And there was no ID down on the floor, but there were other items. The room was in disarray, like a table had been knocked over, there were scissors, pencils. There was a screwdriver in the floor and he was reaching down towards that and I told him not to do that any more.

>       \*     \*     \*     \*     \*     \*     \*

> I told him not to bend down on the floor any more. A few seconds later he bent down again. At that point I placed him in a pair of handcuffs and informed him that he was not under arrest, but I was detaining him because he was making me nervous bending down towards potential weapons on the floor.

After Officer Motley handcuffed Kelly, he examined the tube the fireman earlier had found and decided to arrest Kelly. He explained his reason for doing so as follows:

> Q. Once you observed that the tube with the white substance, did eventually you place [Kelly] under arrest?

> A. I was trying not to. I was hoping he would go to the hospital to get treated voluntarily, so I could take the items to the lab and not have to babysit him at the hospital, if we placed him under arrest.

> There were some issues. He didn't want to go. The firefighters were going to do implied consent, so just to make it easier I officially placed him under arrest, so there wouldn't be any issues with consent to treatment.

>       \*     \*     \*     \*     \*     \*     \*

> Q. And you arrested him, you said because you wanted to not have a problem with him giving consent for treatment, you wanted to get him out of the room?

> A. Correct. There were some gray areas in there and it just made it easy and I placed him under arrest.

After Officer Motley arrested Kelly, he searched Kelly and the room as an incident to the arrest.

## II.

The Fourth Amendment affords a person in his home the highest protection from government intrusion.

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home -- a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[at] the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."

Payton v. New York, 445 U.S. 573, 589-90 (1980) (citations omitted). Because of these protections, the government bears a heavy burden of proving a compelling need to enter a home without a warrant. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); Chimel, 395 U.S. at 762.

The Commonwealth did not meet that burden and did not suggest at trial that it had. Furthermore, the trial judge did not even address the reason for excusing the warrant requirement in this case. Kelly's attorney argued that the evidence proved a warrantless entry by the police officers, that the officer received no consent to enter, and that the entry was not justified by exigent circumstances. The prosecutor did not in any fashion address the entry and only argued that the search was valid because it was "a search incident to [and] contemporaneous with the arrest." In denying the motion to suppress, the trial judge merely ruled that the police officer "can be there." For the first time on appeal, the Commonwealth argues that the police officers "lawfully followed in the footsteps of the firefighters." At trial, however, the prosecutor argued no facts that would form the predicate basis for this suggestion and, indeed, never made this argument. Thus, we cannot conclude that the trial judge's cryptic ruling that the officers "can be there" is sufficient to establish that the Commonwealth met its heavy burden of proof.

- 12 -

In support of the argument now made on appeal that the police officers "lawfully followed in the footsteps of the firefighters," the Commonwealth relies upon Jones v. Commonwealth, 29 Va. App. 363, 512 S.E.2d 165 (1999). Even if we assume the trial judge contemplated Jones when he ruled, it provides no basis upon which to uphold the trial judge's refusal to suppress the evidence.

Jones is based on the Supreme Court's decision in Michigan v. Tyler, 436 U.S. 499 (1978). Significantly, the Court held in Tyler that "the Fourth Amendment extends beyond the paradigmatic entry into a dwelling by a law enforcement officer [or health, fire, or building inspectors] in search of the fruits or instrumentalities of crime." 436 U.S. at 504. The Court further held that even when the search is "for administrative purposes" the law recognizes

> no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately.

Id. at 506. In view of these principles, the Supreme Court reiterated that it has recognized only a narrow exception to the Fourth Amendment warrant requirement when an exigency exists, giving rise to "compelling need for action and no time to secure a warrant." Id. at 509. It found such an exception in Tyler, holding as follows:

> A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry "reasonable." Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. And once in a building for this purpose, firefighters may seize evidence of arson that is in plain view.

436 U.S. at 509. The Supreme Court specifically has noted that it "has recognized only a few such emergency conditions, see e.g., United States v. Santana, 427 U.S. 38, 42-43 (1976) (hot pursuit of a fleeing felon); Warden v. Hayden, 387 U.S. 294, 298-99 (1967) (same); Schmerber

- 13 -

v. California, 384 U.S. 757, 770-71 (1966) (destruction of evidence); Michigan v. Tyler, 436 U.S. 499, 509 (1978) (ongoing fire), and [has further noted that it] has actually applied only the 'hot pursuit' doctrine to arrests in the home, see Santana, *supra*." Welsh, 466 U.S. at 750.

We relied upon the Tyler fire exception in Jones, where the evidence established that "police and firefighters responded to a fire at appellant's apartment." 29 Va. App. at 366, 512 S.E.2d at 166. As a firefighter was ventilating the building and searching for people inside, he found a gun and narcotics. Id. at 366-67, 512 S.E.2d at 166. Citing Tyler, we held that the exigent circumstances of the fire negated any claim that a Fourth Amendment violation occurred when the firefighter discovered the contraband. We further held that "[t]he exigency created by the fire still existed when [the police officer] entered the building" in response to the firefighter's summons to come and view his discovery. Jones, 29 Va. App. at 372, 512 S.E.2d at 169.

The rule we adopted in Jones is that the exigency of a fire excused the warrant requirement and permitted "intrusion by government officials [to] continue for a reasonable time after the fire has been extinguished to allow fire officials to fulfill their duties, including making sure the fire will not rekindle, and investigating the cause of the fire." 29 Va. App. at 369, 512 S.E.2d at 168; accord Tyler, 436 U.S. at 510. In Tyler, the Supreme Court reasoned that entry and reentry by fire and other personnel were "continuations of the first entry," did not require a warrant, and were thus reasonable. Id. at 510-11. Both Tyler and Jones recognize, however, that when the exigency ends a warrant is required. Tyler, 501 U.S. at 510; Jones, 29 Va. App. at 369, 512 S.E.2d at 168.

Tyler and Jones do not assert or support the proposition that police have a right of entry to follow the "footsteps" of firemen who enter a home to provide para-medical assistance or to transport a person to seek medical assistance. Simply put, Tyler and Jones do not provide the proper analytical framework for this case because the exigency that excused the warrant

requirement in those cases, that is, a fire, did not exist here.  The evidence proved that the sole justification for the police officers' warrantless entry was to investigate the fireman's belief that the tube he found while looking around the room for his "safety" may have contained a narcotic.

When Kelly's father gave firemen consent to enter the home, no fire or threat of fire existed.  The evidence also did not prove a life-threatening medical condition existed.  The fireman testified that when he arrived, although Kelly was "agitated" and behaving strangely, Kelly appeared to be conscious and his vital signs were "within normal limits."  The fireman, by his own admission, said the search was not done to diagnose or treat Kelly, but "primarily for [the firemen's] safety."  In addition, the evidence failed to establish that a medical emergency existed when the police arrived.  Kelly was responding and had normal vital signs.  The police officers used the occasion to interrogate him about criminal conduct.  Moreover, Officer Trunk testified that after Kelly had been arrested and led from the room, they allowed Kelly to return to the room to get a jacket and shoes before the firemen took him to the hospital.  This evidence simply failed to prove an exigency or a medical emergency.

The mere fact that firemen or other para-medical personnel have entered a home does not eliminate the protection the Fourth Amendment affords an individual against warrantless governmental intrusion.  Likewise, entry into a home by one government employee does not mean that law enforcement officers can follow into the home, for any purpose, and without a warrant.

Without a fire, or an exigency arising from a fire, there was no reason for the police officers to enter Kelly's home without a warrant.  That they were "called to the scene" is not a basis upon which they could lawfully enter Kelly's residence without a warrant or consent.  The fireman's discovery of a broken glass tube in the home does not excuse the entry by the police officers without first obtaining a warrant.

- 15 -

What occurred here is precisely what the Fourth Amendment expressly prohibits: an officer in the field, instead of a neutral and detached magistrate, made the determination that probable cause existed to enter Kelly's home.

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences that reasonable men draw from evidence. Its protection consists in requiring those inferences be drawn by a neutral, detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

Johnson v. United States, 333 U.S. 10, 13-14 (1948) (footnote omitted). Likewise, the fireman, acting in a para-medical capacity, was not constitutionally authorized to make a probable cause determination and invite police officers to enter the residence without a warrant, to search the premises, and to make a warrantless arrest within the residence.

"Prior decisions of [the Supreme] Court . . . have emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated.'" Welsh, 466 U.S. at 749 (citations omitted).[8]

---

[8] Because individuals possess the highest expectation of privacy in their homes, the Supreme Court "ordinarily afford[s] the most stringent Fourth Amendment protection" to the sanctity of private dwellings. United States v. Martinez-Fuente, 428 U.S. 543, 561 (1976). Thus, the police officer's warrantless entry to Kelly's home and seizure therein are perforce in a different category of constitutional violations than seizures such as in United States v. Jacobsen, 466 U.S. 109, 111-12 (1984) (where federal agents reopened a package in a Federal Express office and found cocaine after employees in that office earlier had opened the package and found white powder), and in Illinois v. Andreas, 463 U.S. 765, 767 (1983) (where a customs inspector opened a package at the airport, found concealed marijuana, and then permitted a drug enforcement officer to test the marijuana before resealing it). Significantly, in neither case did the officers use the discovery of narcotics as a basis to enter a residence without a warrant. In Jacobsen, the officers "obtained a warrant to search the place to which [the package] was addressed, executed the warrant, and arrested respondents." 466 U.S. at 112. In Andreas, the officers delivered the package to an apartment then "left to secure a warrant to enter and search respondent's apartment." 463 U.S. at 767. Although an officer later arrested Andreas after he

The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.

McDonald v. United States, 335 U.S. 451, 455-56 (1948).[9]

---

emerged from his apartment with the package, the seizure and arrest did not occur inside the residence without a warrant even though the officers knew from the prior discovery during an administrative search at the airport that narcotics were within the apartment. In both Jacobsen and Andreas, the officers sought warrants to enter and search the residences because they understood the Supreme Court's unambiguous ruling that the warrantless "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States District Court, Eastern District of Michigan, 407 U.S. 297, 313 (1972).

[9] The Payton mandate is quite clear: absent exigent circumstances, the threshold of the home cannot be crossed without a warrant. 445 U.S. at 583-90. Yet, the Commonwealth would have us adopt a rule that simply ignores the Fourth Amendment's fundamental protection of the home. In this case, officers could have easily obtained a warrant, affirming the warrant's procedure, "long adhered to" and designed to "minimize the danger of needless intrusions" as occurred here. Id. at 586. The historical foundation of the Fourth Amendment required a warrant under these circumstances.

It is thus perfectly clear that the evil the Amendment was designed to prevent was broader than the abuse of a general warrant. Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment. Almost a century ago the Court stated in resounding terms that the principles reflected in the Amendment "reached farther than the concrete form" of the specific cases that gave it birth, and "apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life."

Id. at 585 (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)).

The Court's reasoning in Payton is based on the heightened expectations of privacy inherent in private residences. Thus, the Court recognized that "'[a] greater burden is placed . . . on officials who enter a home or dwelling without consent'" because "'[f]reedom from intrusion into the home or dwelling is the *archetype of the privacy protection secured by the Fourth Amendment*.'" 445 U.S. at 587 (quoting Dorman v. United States, 435 F.2d 385, 389 (D.C. Cir. 1970)) (emphasis added). The Court continued:

This case expands the exceptions to the warrant requirement in a way not supported by the rationale for creating the exceptions. For these reasons, I dissent.

---

"To be arrested in the home involves not only the invasion of those attendant to all arrests, but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant . . . in the absence of exigent circumstances, even when it is accomplished . . . *when probable cause is clearly present*."

Payton, 445 U.S. at 588-89 (quoting United States. v. Reed, 572 F.2d 412, 423 (1978)) (emphasis added).