COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Fitzpatrick, Judges Elder and Kelsey
Argued at Richmond, Virginia


EDWARD THOMAS WILSON
                                                            OPINION BY
v.         Record No. 0560-04-2            JUDGE LARRY G. ELDER
                                                          MARCH 1, 2005
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
J. Howe Brown, Judge Designate

W. Todd Watson (Hargett & Watson, PLC, on brief), for appellant.

Steven A. Witmer, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


        Edward Thomas Wilson (appellant) appeals from his bench trial conviction for driving

under the influence of alcohol in violation of Code § 18.2-266.  On appeal, he contends the trial

court's denial of his motion to suppress was error.  He argues the off-duty law enforcement

officer from another jurisdiction, who observed his driving, acted improperly under color of

office to effect a seizure and conduct the investigation that led to appellant's conviction.  He also

contends the Commonwealth's failure to procure or permit him to obtain a blood test amounted

to a violation of his due process rights under the United States and Virginia Constitutions.  We

hold the evidence, viewed in the light most favorable to the Commonwealth, established the

off-duty officer did no more than a citizen would have been entitled to do under similar

circumstances and, thus, that the "color of office" doctrine was not implicated.  We also hold that

the Commonwealth's failure to permit or provide a breath or blood alcohol concentration test did

not violate appellant's due process rights under the facts of this case.  Thus, we affirm the

conviction.

I.

BACKGROUND

At about 12:30 a.m. on September 9, 2003, Reed Partlow, an off-duty deputy sheriff from Loudoun County, was passing through Culpeper County with his wife and daughter on the way home from a vacation. While Partlow was traveling in his personal vehicle on a curving, two-lane portion of Route 3 that was marked with a "double yellow line for no passing," a convertible Rolls Royce traveling in the opposite direction "almost collided with [Partlow's] vehicle head-on" and "actually ran [Partlow's vehicle completely] off the road." Partlow was able to turn his van around without losing sight of the convertible and began to follow it. While they followed the convertible through Culpeper, Orange and Spotsylvania Counties, Partlow's wife contacted authorities in the various counties in an effort to get someone to intercept the convertible.

The convertible's top was down, and Partlow saw only one person in the car, appellant. When Route 3 "change[d] into four lane[s] a little further down the road," Partlow flashed his headlights a few times, "trying to get [appellant's] attention and hoping he would pull over," but "[i]t didn't appear that [appellant] even noticed." After additional unsuccessful attempts to get appellant to pull over, Partlow ceased trying to get appellant's attention and simply continued to follow him.

When the convertible entered Spotsylvania County, it "continued weaving from side to side," "crossing the center line several times" "as [two cars] were passing by [it]" in the opposite direction. At one point, the convertible's right wheels "actually left the roadway" and were "on the dirt," and the convertible "swerved, just barely missing several mailboxes . . . and paper boxes."

Some distance later, the convertible made "a relatively sharp turn" into the parking lot of a Fasmart convenience store. The convertible then came to a stop directly "in front of the store[, taking] up two spots." Partlow had followed appellant's vehicle a total of about ten miles from the point where appellant's driving had forced Partlow's van off the road.

Partlow parked his van about thirty feet away from appellant's vehicle "so that [he] would be completely away in case [appellant] threw it up in reverse and started to back up." Partlow was in civilian clothing but put his badge and his holstered service weapon on his belt "because [he] wasn't sure what [he] was getting into at that point."

As Partlow approached the convertible on foot, appellant was stepping out of the driver's seat, and appellant placed one foot on the ground "before [Partlow] even said anything." When Partlow "got closer" to the convertible and appellant had placed one foot on the ground, Partlow

> identified himself as a deputy sheriff from Loudoun County and advised [appellant] that . . . [he] was not from this jurisdiction, that [he] suspected [appellant] was driving under the influence and that [he] had called Spotsylvania County and that they were sending a deputy sheriff and that they would be looking into that situation.

Although appellant was already in the process of getting out, Partlow asked him to step out of the vehicle. Partlow made no physical contact with appellant at that time. Appellant "finished stepping out of the car and just stood there" with "both hands, one on the door and one on the side of the car, as if he was balancing himself." He told Partlow he had stopped there to get milk on his way home. Appellant asked to see Partlow's badge, and Partlow showed it to him. Partlow "could smell the odor of alcohol about [appellant's] person," observing that it "seemed to be most notable when he would speak," and Partlow repeated that he suspected appellant was driving under the influence. Appellant responded that he was "trying to get to Culpeper and must have taken a wrong turn, and he asked Partlow how to get to Culpeper.

Partlow noticed appellant's eyes "had a glassy appearance," his speech was "slightly slurred," and he "had an unsteady gait" that was very different from the gait Partlow saw appellant display later "when he came to court the first time." Partlow asked appellant "if [he] could pat [appellant] down for [Partlow's] safety, to make sure he didn't have any weapons on him." Appellant agreed, and Partlow "patted him down lightly." Partlow then asked appellant to walk to the back of the convertible, and while doing so, appellant "grabbed the vehicle . . . three times . . . as if to keep him[self] from falling over." When appellant got to the rear of the vehicle, "he couldn't stand without wavering back and forth," and Partlow "asked him just to put his hands on the trunk of the vehicle to keep from falling."

Partlow and appellant stood at the back of the car for about five minutes before the Spotsylvania County authorities arrived. During that time, appellant asked at least three more times to see Partlow's badge and sheriff's department identification. Appellant also "appeared to be somewhat confused as to where he was" and "had some periods of [what] appeared to be memory lapse[s]."

While waiting for someone to arrive from the Spotsylvania County Sheriff's Office, Partlow inquired whether appellant

> remembered almost hitting a vehicle head-on near Stevensburg and [appellant] stated, no, no, I don't remember any of that. And then [Partlow] asked him, . . . do you remember running off the road and almost hitting some mailboxes. And [appellant] said, no, I don't, but . . . it may have happened.

Partlow asked appellant if he had had anything to drink that night, and appellant responded that he had. Partlow then asked "when was the last time that [appellant] had had something to drink," and he responded "about an hour ago." When Partlow asked appellant "where did he have his last drink," appellant responded simply that he "was trying to get to Culpeper." When

- 4 -

Partlow asked appellant how much he had had to drink, appellant "said, well, I'd rather not answer that."

At that point, appellant "appeared to be getting a little bit antsy" about remaining at the scene, so Partlow "[tried] to initiate something that would voluntarily keep him there." Appellant "never attempted to leave," and Partlow "never actually asked him to stay there" or said "you're detained, you can't leave." Partlow did, however, tell appellant something like, "[I'm] going to give [you] some field tests for sobriety." Partlow inquired whether appellant had any physical or health problems that would prevent him from taking the tests, and appellant responded that he did not. Partlow then asked appellant "what his education level was." Appellant "never really said," so Partlow inquired whether he could "say [his] ABCs," and appellant responded that he could. Partlow then "explained again to him that Spotsylvania was sending a deputy there and that, as soon as they got there, that they were going to take over everything that was transpiring, that everything that was said, I would tell them and they would go from there." Partlow then said, "[C]an you say your ABCs from A to L?" Appellant responded, "A, and then it was, uh, uh, well, I don't understand why I have to do this." At that point, Spotsylvania County Sheriff's Deputy K.C. Butler arrived on the scene, and Partlow had no additional direct contact with appellant.

Partlow gave Deputy Butler the keys to appellant's vehicle, which Partlow had obtained from appellant "at some point" during the encounter. Partlow may or may not also have given Deputy Butler appellant's driver's license. Partlow knew he did not ask appellant for his driver's license but testified "he may have asked [appellant] . . . *if* he had a driver's license." (Emphasis added).

Deputy Butler, who had been a sheriff's deputy for only five or six months at that time, responded to the scene as a call about a reckless driver. When Deputy Butler arrived, Partlow

suggested to Deputy Butler that appellant should be charged with driving under the influence. Deputy Butler observed appellant's behavior, asked him some questions, and informed appellant he suspected appellant of being drunk in public. Deputy Butler did not indicate an intent to arrest appellant for driving under the influence and testified that he believed he could not do so because he did not personally observe appellant's driving.

Deputy Butler contacted another officer, Deputy Pittman, to bring a preliminary breath test device to the scene. Deputy Butler advised appellant "of his rights with respect to th[e] preliminary breath test" and the implied consent law by reading from the beige card issued by the sheriff's department even though he did not plan to charge appellant with DUI. Deputy Butler said he gave appellant the implied consent advice even though he was not planning to charge him with DUI because it was "just a procedure [he did] with everybody." Deputy Butler also administered three other field sobriety tests. After receiving the results of those tests, Deputy Butler arrested appellant for being drunk in public and transported him to the magistrate's office.

When Partlow learned that Deputy Butler planned to charge appellant only with being drunk in public and not with driving under the influence, Partlow followed Deputy Butler and appellant to the magistrate's office in an effort to obtain a warrant charging appellant with the driving offense. The magistrate would not allow Partlow to charge appellant with DUI, and "she wouldn't give a reason." The magistrate issued a warrant charging appellant with being drunk in public, and appellant was transported to the regional jail, where he was held overnight without bond. Deputy Butler did not offer appellant "a more formal [alcohol concentration] test like the one that's at the Sheriff's Department on a machine that's calibrated regularly by the forensic bureau."

The following morning, Partlow contacted the magistrates' office again and spoke to a different magistrate. He "explained what had happened, explained what [he] wanted to do and

asked [the magistrate] if there was any reason that [he] couldn't [obtain a warrant charging

appellant with DUI] and [the magistrate] said, no, absolutely not." Partlow then drove back to

the magistrates' office and swore out a criminal complaint, and at 11:00 a.m., the magistrate

issued a warrant against appellant for DUI. The warrant was served on appellant at 1:24 p.m.

that same day.

Prior to appellant's trial for DUI, he moved to suppress evidence on dual grounds. He

contended that because Partlow was out of his jurisdiction, he had the authority to make only a

citizen's arrest and that any evidence obtained after Partlow exceeded the scope of that authority

was inadmissible.[1] He also contended that Partlow's actions constituted an arrest for DUI--even

though Deputy Butler obtained a warrant only for being drunk in public--triggering his rights

under the implied consent law to a blood or breath test.

The trial court denied the motion on both grounds, ruling as follows:

> I don't think . . . Partlow . . . acted under color of his office. He
> explained who he was and he explained the presence of the gun, to
> protect himself, for heaven's sake. He doesn't know what he's
> getting into with this guy who . . . a while ago ran him off the road
> and has done other erratic driving behavior. But he explained very
> clearly that he had no jurisdiction, . . . wasn't his bailiwick, he was
> from somewhere else. So, he didn't use his position to detain
> [appellant].
>
> [W]hat he did in the so-called investigation was to use a ruse.
> He did what a citizen might do. He said, you know, the police are
> coming and they're going to give you this test and he . . . used a
> ruse, if you will, to try to get [appellant], voluntarily, to stay and
> that [appellant] didn't take it as a police officer is pretty well
> shown by [appellant's] reaction to it. He starts to do it and then he
> says, why do I have to do this. He wasn't . . . fooled by the police
> officer or made to think that he was acting under color of law and

---

[1] In his written motion, appellant alleged Partlow "illegally detained and . . . arrested [appellant] while acting under color of law . . . in violation of the Fourth Amendment." At the hearing on his motion, appellant conceded that Hudson v. Commonwealth, 266 Va. 371, 585 S.E.2d 583 (2003), permitted Partlow, acting as a private citizen, to detain and arrest appellant. He argued only that Partlow's investigation exceeded the scope of that in which a citizen was authorized to engage.

under color of office and I don't think Partlow was. I don't find that Partlow arrested [appellant] at the scene. He simply took steps to try to get him to stay until the real police officers with the jurisdiction could get there. There was no arrest by Partlow there.

And I don't think the implied consent law applies at all. . . .

The parties then agreed to offer no additional evidence on the merits of the charge, and the court convicted appellant on the evidence already presented, noting appellant's case was "one of the strongest cases of DUI without the chemical test" that the court had seen.

Appellant noted this appeal.

II.

ANALYSIS

Appellant makes no "complaint" regarding "the initial arrest or approach by Deputy Partlow" but contends that the encounter became an "investigation" and that the information Partlow obtained during that investigation constituted a "collection of evidence under the color of law" in violation of his constitutional rights because the investigation "[went] far beyond" what "a citizen could or would [have] achieve[d] in the context of a citizen's arrest." We disagree. We hold further that the Commonwealth's actions in failing to procure a blood or breath alcohol concentration test for appellant did not constitute a violation of due process under the facts of this case.

An appellant's claim that evidence was seized in violation of the Fourth Amendment "presents a mixed question of law and fact that we review *de novo* on appeal. In making such a determination, we give deference to the factual findings of the trial court and independently determine whether the manner in which the evidence was obtained [violated] the Fourth Amendment." Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002) (citations omitted); see also Ornelas v. United States, 517 U.S. 690, 691, 699, 116 S. Ct. 1657, 1659, 1663, 134 L. Ed. 2d 911 (1996). An appellant has the burden to show that, when the

- 8 -

evidence is considered in the light most favorable to the Commonwealth, the trial court's denial

of his motion to suppress constituted reversible error.  Murphy, 264 Va. at 573, 570 S.E.2d at

838.

A.

"COLOR OF OFFICE" DOCTRINE

The Virginia Supreme Court recognized the "'under color of office' doctrine" in Hudson

v. Commonwealth, 266 Va. 371, 377, 585 S.E.2d 583, 586 (2003), describing it as

"'prohibit[ing] a law enforcement officer from using the indicia of his or her official position to

collect evidence that a private citizen would be unable [to] gather,'" id. (quoting State v. Gustke,

516 S.E.2d 283, 293 (W. Va. 1999)).

> [T]he language of the case law indicates that the "under color of
> office" doctrine limits the power to arrest.  But this doctrine does
> not prevent officers from making an otherwise valid citizen's arrest
> just because they happen to be in uniform or otherwise clothed
> with the indicia of their position when making the arrest.  When
> officers outside their jurisdiction have sufficient grounds to make a
> valid citizen's arrest, the law should not require them to discard the
> indicia of their position before chasing and arresting a fleeing
> felon.  Any suggestion that officers could not make a valid
> citizen's arrest merely because they happened to be in uniform or
> happened to be in a police car at the time they inadvertently
> witnessed a felony outside their jurisdiction would be ridiculous.

Gustke, 516 S.E.2d at 293 (quoting State v. Phoenix, 428 So. 2d 262, 266 (Fla. Dist. Ct. App.

1982) (citations omitted)).

In Gustke, the West Virginia Supreme Court interpreted these princples as permitting

uniformed officers to make a valid citizen's arrest for an offense that "was a misdemeanor that

amounted to a breach of the peace and was committed in [the officers'] presence."  Id.  The court

approved a citizen's arrest by an off-duty police officer outside his jurisdiction who "observed a

vehicle that was being driven erratically and was weaving from lane to lane."  Id. at 286.  The

officer acting as "citizen" was still in uniform and driving his marked police vehicle when he

- 9 -

made the arrest, which he accomplished by "engag[ing] the siren and lights on his cruiser." Id. The officer asked to see the arrestee's identification and requested that he await the arrival of a deputy sheriff from the appropriate jurisdiction, but he did not collect any "evidence regarding [the arrestee's] sobriety, or lack thereof." Id. at 293. The West Virginia Supreme Court held that "[b]ecause [the officer] did not use the indicia of his official position as a law enforcement officer to gather evidence against [the arrestee], we need not decide today whether to adopt the 'under color of office' doctrine." Id. It concluded only that a uniformed officer's use of his marked vehicle's emergency lights and siren to effect a traffic stop of an erratic driver, accompanied by a request for identification from that driver, did not violate the Fourth Amendment. Id. Thus, the West Virginia Supreme Court had no occasion to consider the parameters of a citizen's ability to gather admissible evidence in the course of a citizen's arrest.

Contrary to appellant's assertions, Hudson does not require the suppression of *any* evidence obtained by a police officer effecting a citizen's arrest. At most, it supports the suppression of "evidence that a private citizen would be unable [to] gather'" if the method the officer used to gather that evidence amounted to a constitutional violation. Hudson, 266 Va. at 377, 585 S.E.2d at 586 (quoting Gustke, 516 S.E.2d at 293). Further, in Hudson, like in Gustke, the Virginia Supreme Court had no occasion to consider the parameters of a citizen's ability to gather admissible evidence because the officer "made no attempt of any type to gather evidence against Hudson" and "merely detained him until a duly authorized police officer arrived." Hudson, 266 Va. at 378, 585 S.E.2d at 587.

The District Court of Appeal of Florida has held that officers acting as citizens "may investigate and gather evidence only through the use of their own senses and through the voluntary cooperation of citizens; they may not employ the power or color of their office either

expressly or by implication in order to gather evidence or ferret out criminal activity not otherwise observable." Phoenix, 428 So. 2d at 266 & n.2.

Here, Partlow clearly did not use the color of his office to observe appellant's erratic driving or to stop appellant's vehicle after following it for about ten miles. Although Partlow made numerous attempts to signal appellant to stop, Partlow was driving his personal vehicle at the time and was not displaying any visible indicia of his authority as a law enforcement officer when he did so. Only after appellant had already parked his convertible and placed one foot on the ground as he began to exit the vehicle did Partlow approach, wearing his badge and service revolver, and identify himself as a law enforcement officer. Further, Partlow testified that when he told appellant he was a deputy sheriff, he also clearly indicated he was outside his jurisdiction and that he had notified the proper authorities because he believed appellant had been driving while under the influence of alcohol. Appellant provided no evidence to contradict Partlow's testimony, and the trial court found that testimony credible. Further, although appellant concedes that, per Hudson, Partlow would have been justified in making a citizen's arrest for DUI, the trial court found that no arrest occurred, and the evidence supports a finding that Partlow's actions amounted, at most, to a detention.

Finally, Partlow's testimony concerning his observations of appellant and appellant's behavior at the scene of the encounter--including that appellant smelled of alcohol, had difficulty standing, seemed confused while talking, and claimed not to remember almost running Partlow's vehicle off the road but admitting that "it could have happened"--constituted evidence that could have been gathered by any citizen engaging appellant in conversation while attempting to detain him until a law enforcement officer from that jurisdiction could arrive. Although appellant argues Partlow's request to him to perform a field sobriety alphabet test exceeded the scope of a citizen's authority, appellant refused Partlow's request to perform such a test. Thus, assuming

- 11 -

without deciding that the administration of field sobriety tests is the sort of investigation that would implicate the "color of office" doctrine and would amount to a constitutional violation requiring suppression, no evidence resulted from Partlow's attempts, and there was nothing to suppress. Further, by refusing Partlow's request to perform that field sobriety test and declining to answer Partlow's question about how much he had had to drink, appellant indicated an awareness of Partlow's lack of official authority.

The trial court expressly found as follows:

> [W]hat [Partlow] did in the so-called investigation was to use a ruse. He did what a citizen might do. He said, you know, the police are coming and they're going to give you this test and he . . . used a ruse, if you will, to try to get [appellant], voluntarily, to stay and that [appellant] didn't take it as a police officer is pretty well shown by [appellant's] reaction to it. He starts to do it and then he says, why do I have to do this. He wasn't . . . fooled by the police officer or made to think that he was acting under color of law and under color of office and I don't think Partlow was.

The evidence, viewed in the light most favorable to the Commonwealth, supports those findings and conclusions. Thus, we hold the trial court did not err in denying the motion to suppress on that ground.

B.

DUE PROCESS

Appellant contends his due process rights were violated because the implied consent law required the Commonwealth to procure or permit him to obtain blood or breath testing to determine his level of intoxication. We hold the implied consent law did not come into play because the record supports the trial court's finding that appellant was not arrested for DUI in the Fasmart parking lot.

Code § 18.2-268.2 provides in relevant part as follows:

> A. Any person, whether licensed by Virginia or not, who operates a motor vehicle upon a highway, as defined in § 46.2-100,

in this Commonwealth shall be deemed thereby, as a condition of such operation, to have consented to have samples of his blood, breath, or both blood and breath taken for a chemical test to determine the alcohol, drug, or both alcohol and drug content of his blood, if he is arrested for violation of §§ 18.2-266, 18.2-266.1 or § 18.2-272 or of a similar ordinance within three hours of the alleged offense.

B. Any person so arrested . . . shall submit to a breath test. If the breath test is unavailable or the person is physically unable to submit to the breath test, a blood test shall be given. . . .

Here, the trial court found Partlow did not arrest appellant in the Fasmart parking lot. We held above that the record supports the trial court's finding and indicates that Partlow's actions constituted, at most, a detention rather than an arrest. Further, when Deputy Butler arrived on the scene shortly before 1:00 a.m., he arrested appellant for public intoxication rather than driving under the influence. Thus, although Deputy Butler advised appellant of the implied consent law, the Commonwealth had no duty to provide appellant with an opportunity for a blood or breath test based on an arrest for public intoxication. Although appellant was subsequently arrested on a warrant alleging he drove under the influence, that arrest occurred about twelve hours later, at 1:24 p.m. Thus, his DUI arrest did not occur "within three hours of the alleged offense," as required to bring the implied consent and testing provisions of Code § 18.2-268.2 into play.

III.

For these reasons, we hold the evidence, viewed in the light most favorable to the Commonwealth, established the off-duty officer did no more than a citizen would have been entitled to do under similar circumstances and, thus, that the "color of office" doctrine was not implicated. We also hold that the Commonwealth's failure to permit or provide a breath or

blood alcohol concentration test did not violate appellant's due process rights under the facts of

this case. Thus, we affirm the conviction.

<u>Affirmed.</u>