COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Kelsey and Senior Judge Overton
Argued by teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
v.        Record No. 0569-05-1            JUDGE D. ARTHUR KELSEY
                                         SEPTEMBER 6, 2005
RUSSELL HOPSON


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Louis R. Lerner, Judge

Susan L. Parrish, Assistant Attorney General (Judith Williams
Jagdmann, Attorney General, on briefs), for appellant.

Ronald L. Smith (Smith & Smith-Ashley, on brief), for appellee.


A grand jury indicted Russell Hopson for the murder of Travesta Williams and for

felonious use of a firearm.  Before trial, the trial court suppressed the evidence of Williams's

body found by police officers in Hopson's residence.  The officers violated the Fourth

Amendment, the trial court held, by entering Hopson's residence without a warrant.  We

disagree, reverse the suppression order, and remand the case for trial.

I.

While on routine patrol, Officers Wilson and Daniel received a dispatch from police

headquarters.  Both officers testified the dispatched information stated a neighbor called the

police reporting she "heard" 10 to 12 gunshots coming from "inside" a brick residence "across"

the street from her.[1]  When directly asked in cross-examination, "What was the dispatch?"

Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Another officer, Detective Herb, arrived on the scene later.  She recalled the dispatcher
saying that the shots were fired "at" or "from" the brick home across the street from 2108
Victoria Boulevard.

Daniel replied: "It was shots *fired inside of a brick building* – or a brick house – *inside the house* is what they were saying that I recall."[2] The caller also said that, after the shots were fired, two males "ran out of the house and ran down the street." "She gave a description of the location as across the street from *my home*." Officers Wilson and Daniel, in separate cars, arrived at 2108 Victoria Boulevard at about the same time.

Officer Wilson confirmed that the dispatcher gave the specific street number of the caller's residence. On cross-examination, however, Wilson had trouble remembering the address. In response, Hopson's counsel refreshed Officer Wilson's recollection by saying, "Let me read you something and ask you if this helps your memory. This is the testimony . . . under oath of the witnesses who called dispatch, Mr. Hogge, who was in the presence of his wife calling dispatch, who said, 'The house is across the street.'" Hopson's counsel then read Hogge's testimony into the record:

| Question to Hogge: | Do you know what the address is? [speaking of the house where the gunfire was heard] |
| --- | --- |
| Hogge's Answer: | No, 2107 or something like that. *I'm in 2108.* The numbers are kind of weird there. |

Given that information, Hopson's counsel again asked Officer Wilson if he knew "at the time" of the dispatch if he "got a particular address or just a description saying across the street from 2108?" Officer Wilson replied: "That's probably how I got the address is going across the street from 2108, yes sir."

The officers immediately went to 2105 Victoria Boulevard, one of at least two brick houses across the street from 2108 Victoria Boulevard. It was shortly after 10:15 p.m. What

---

[2] Hopson claims Officer Daniel contradicted Officer Wilson about the dispatch, and thus, created a factual "discrepancy" that should be resolved against the Commonwealth. *Post*, at 15. If there were such a discrepancy in their testimony, we would certainly agree it inures to Hopson's benefit. No fair reading of the transcript, however, supports Hopson's claim.

drew their attention to that house was that one of the doors was partly open.[3]  They called out a couple of times for a reply from anyone inside.  Having received no response, they "then made a decision to enter the home."[4]  They did so "to check on the welfare of anybody in the house because of the witness stating that there were shots coming from inside the home."  Fearing "the worst," the officers said they thought someone might be injured or killed.  They then entered Hopson's house and found Williams lying on the floor, mortally wounded by gunfire.

Based upon the discovery of the body, Officers Wilson and Daniel reported their findings and exited the home "so as not to contaminate the scene."  They remained posted at the door until Detective Herb arrived.  She later obtained a search warrant to search the remainder of Hopson's residence.

Charged with murder and use of a firearm, Hopson moved to suppress the evidence seized from his house on the ground that the officers' warrantless entry violated the Fourth Amendment.  His argument, however, focused entirely on the alleged absence of probable cause and exigent circumstances.  Hopson never challenged (indeed, he appeared to fully accept) the officers' testimony about a report of gunfire coming from "across the street from 2108 and that it's a brick house."  Instead, his counsel argued only that the officers violated the Fourth Amendment by failing to corroborate the report.  "So the search warrant is bootstrapped to the

_____

[3] Officer Wilson testified about a door of the residence being partly open when they arrived.  He recalled it being the main wooden exterior door.  He was uncertain, however, whether a screen door existed and, if so, whether it too was open.  Officer Daniel specifically recalled both the "screen door" and the "storm door" being open.  These discrepancies have no bearing on our holding.

[4] Officer Daniel also suggested he "peeked" through the open door of Hopson's residence and saw various items in "disarray."  On cross-examination, however, the officer provided no details about his observations.  Giving Hopson the most favorable assessment of this testimony, we conclude the trial court as factfinder could have concluded either that the officer crossed the threshold of the residence (making any further observations legally irrelevant for purposes of assessing the legality of the entry) or that, whatever he saw, it was too insignificant to be recalled with any specificity (making the observations factually immaterial).  For purposes of our analysis, therefore, we place no weight on this testimony.

unlawful entry," counsel concluded, "that doesn't meet the test of the Supreme Court, probable cause plus exigent circumstances."

In reply, the prosecutor argued that probable cause was legally irrelevant. If police officers, she asserted, have "articulable facts to believe that there's someone inside the home that's in need of emergency care or police assistance, then they can enter that home without a search warrant." She then surveyed the totality of the circumstances: the report of 10-12 gunshots coming from a brick house across the street; the two fleeing males; the presence of at least one open door; and the absence of any response to the officers' calls into the residence. These circumstances, she concluded, warranted an objectively reasonable belief that "someone was in danger" and "based on that, the officer at that time then entered the home."

In questions to the prosecutor, the trial judge sought to confirm his recollection of the officers' testimony:

| | |
|---|---|
| Court: | And you believe that Officer Wilson and/or Officer Daniel articulated facts in their testimony that would indicate that they believe that someone inside was injured or needed emergency care? |
| Prosecutor: | That there may be someone inside, yes, sir. They had numerous shots fired, they see two – or they heard that there were numerous shots fired. That was the information they received. Numerous shots fired, two people running from the home, the door is left wide open, and they come in and they call out, they see the home in disarray. |
| Court: | The dispatch did not say that two people had run from a home and left the door open, did it? |
| Prosecutor: | No, it didn't say – |
| Court: | The dispatcher said, Two black males running from a home across the street and described it as a brick home; is that correct? |
| Prosecutor: | Yes, sir. When they arrived – |

| | |
|---|---|
| Court: | And Officer Daniel and Wilson arrive, place themselves in front of 2108 and look across the street and pick out one of the two brick homes. They approach the brick home that they see that a door is open. Officer Wilson can't recall if there was, in fact, even a storm door there, but would concede that the picture shows one. Officer Daniel says that the interior door was partially open and the storm door was partially open and he peeked in and saw the house was in disarray. |
| Prosecutor: | If I can correct one thing – |
| Court: | Okay. Correct me. |
| Prosecutor: | The storm door was open. The interior door was partially open. |
| Court: | Okay. The storm door was open and the interior door was partially open and he peeked in and saw that the house was in disarray. |
| Prosecutor: | Yes, sir. |
| Court: | And from thence, everything else took place. |
| Prosecutor: | Yes, sir. |
| Court: | Anything further? |
| Prosecutor: | No, sir. |
| Court: | Mr. Smith [Hopson's counsel], anything further? |
| Smith: | No, sir. |

The trial judge then took a brief recess and, upon returning to the bench, asked counsel for any additional summation they wished to make. Hopson's counsel made a few brief remarks, including that the officers never "articulated" to the court "some reason to believe . . . that someone was injured" prior to their entry into the house. The trial judge then ruled, agreeing with Hopson's counsel that neither officer had "*articulated anything*" that would excuse them from obtaining a warrant prior to entering Hopson's house.

- 5 -

On appeal, the Commonwealth repeats the same arguments made by the prosecutor in the trial court.  In reply, Hopson asserts that the trial judge correctly held that the officers never "articulated" circumstances justifying a warrantless entry.  Hopson does not assert on appeal that the trial judge disbelieved the officers, or found their motives pretextual, or made any factual findings rejecting any aspect of their testimony.  Instead, Hopson contends only that the officers' testimony did not present facts sufficient to authorize the warrantless entry into his residence.

II.

A.  THE APPELLATE STANDARD OF REVIEW

In Kyer v. Commonwealth, 45 Va. App. 473, 479, 612 S.E.2d 213, 216-17 (2005) (*en banc*), we applied a familiar standard of appellate review for addressing the emergency and community caretaker exceptions to the Fourth Amendment's warrant requirement.  Under this standard, we give "deference to the factual findings of the trial court" and "independently determine" whether those facts satisfy the requirements of the Fourth Amendment.  Id.  This approach requires us to decide *de novo* the "ultimate question" whether the officers violated the Fourth Amendment.  Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citation omitted).  The reason for this standard has been explained this way:

> This standard of review, which also has been described by the Supreme Court as independent appellate review, "tends to unify precedent and will come closer to providing law enforcement officers with a defined 'set of rules'" that will, in most instances, enable these officers to honor an accused's constitutional rights.

Commonwealth v. Redmond, 264 Va. 321, 327, 568 S.E.2d 695, 698 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 697 (1996)).[5]

---

[5] See also Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003) ("We apply settled standards of appellate review to decide the present claim that evidence was seized in violation of the Fourth Amendment.  Such a claim presents a mixed question of fact and law that an appellate court reviews *de novo*."); Murphy v. Commonwealth, 264 Va. 568,

This ultimate-question standard marks out the Fourth Amendment boundary between mere factual inferences (triggering factfinder deference) and the purely legal assessment of the constitutional significance of those inferences (requiring *de novo* appellate review). We know we have reached the *ultimate* question in a case when there is nothing left to ask. For example, after the circumstances of a search and seizure are determined, leaving only the question whether "reasonable suspicion" or "probable cause" existed, we treat that last (and thus ultimate) question as a legal issue requiring *de novo* appellate review. Ornelas, 517 U.S. at 695. Similarly, after the facts surrounding a police interrogation have been ascertained, we answer *de novo* the ultimate question whether a "reasonable police officer under the circumstances" should have understood the accused to be requesting counsel. Commonwealth v. Hilliard, 270 Va. 42, 49, 613 S.E.2d 579, 584 (2005) (applying standard to Fifth and Sixth Amendment right-to-counsel claims).

It was just this standard we adopted in Kyer when we held that, on appeal, we must "independently determine" the "ultimate question" whether the facts satisfy the emergency or community caretaker exceptions to the Fourth Amendment. Kyer, 45 Va. App. at 479, 612 S.E.2d at 216-17. Whether a sufficient emergency existed justifying a warrantless entry cannot be a pure factual inference; for if it were, there would never be any *de novo* appellate determination in emergency cases because there are no further questions to be asked. The existence of an emergency — for purposes of the emergency doctrine — is the ultimate issue. See State v. Geisler, 610 A.2d 1225, 1236 (Conn. 1992) (holding that "subordinate factual findings" deserve deference, but "the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed *de novo*").

---

573, 570 S.E.2d 836, 838 (2002); Wilson v. Commonwealth, 45 Va. App. 193, 202-03, 609 S.E.2d 612, 616 (2005).

In this case, Hopson did not argue before the trial court (nor did the judge find) that the testimony of either officer was in any way fabricated or exaggerated. Nor did Hopson claim that their testimony created conflicting sets of factual inferences: one authorizing a warrantless entry, the other not. Instead, Hopson argued only that their testimony — such as it was — did not *articulate* facts justifying a warrantless entry under the Fourth Amendment. Whether this is so or not presents the "ultimate question" that we must "independently determine" under a *de novo* standard. Id. (citation omitted).[6]

B.　THE EMERGENCY EXCEPTION TO THE WARRANT REQUIREMENT

"Among the many interests served by the Fourth Amendment, the privacy interest in one's home has few equals." Kyer, 45 Va. App. at 480, 612 S.E.2d at 217. Even so, "the Fourth Amendment's text endorses no absolutes. It instead condemns only 'unreasonable' searches and seizures." Id. The text of the Fourth Amendment draws the line there; so too must the courts.

"One concession to reasonableness, the emergency exception, recognizes the 'right of the police to enter and investigate' when someone's health or physical safety is genuinely threatened." Id. (citing Reynolds v. Commonwealth, 9 Va. App. 430, 437, 388 S.E.2d 659, 664 (1990), and Mincey v. Arizona, 437 U.S. 385 (1978)).[7] "It rests on the commonsense rationale

---

[6] The dissent's understanding of the standard of review relies on a single sentence lifted from Reynolds v. Commonwealth, 9 Va. App. 430, 437, 388 S.E.2d 659, 663 (1990), stating that the "reasonableness of a police officer's response in a given situation is a question of fact for the trial court and its ruling will not be disturbed on appeal absent clear and manifest error." *Post*, at 20. The characterization of the Fourth Amendment reasonableness test as a pure question of fact, while arguably an overstatement even in 1990, has at any rate been long since superceded by the objective *de novo* test of Ornelas and by our recent *en banc* opinion in Kyer.

[7] At trial, the parties characterize the emergency exception as a subset of the community caretaker doctrine. Some courts accept this description. See, e.g., Martin v. City of Oceanside, 360 F.3d 1078, 1081-82 (9th Cir. 2004) ("In an emergency situation, police officers are permitted warrantless entry into a home as part of their 'community caretaking function.'"). Others do not. See, e.g., State v. Ryon, 108 P.3d 1032, 1041 (N.M. 2005) (rejecting an effort to "conflate the emergency assistance doctrine with the broader community caretaker exception").

that 'preservation of human life is paramount to the right of privacy' protected by the Fourth Amendment." Id. (quoting Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664). The power of police officers to make a warrantless entry in such circumstances "is inherent in the very nature of their duties as peace officers, and derives from the common law." United States v. Barone, 330 F.2d 543, 545 (2d Cir. 1964) (cited in Mincey, 437 U.S. at 392 n.7).

As a general rule, an "'officer's state of mind (except for the facts that he knows) is irrelevant' to the Fourth Amendment inquiry." Kyer, 45 Va. App. at 481 n.2, 612 S.E.2d at 217 n.2 (quoting Devenpeck v. Alford, 125 S. Ct. 588, 593 (2004), and Slayton, 41 Va. App. at 109, 582 S.E.2d at 451). Likewise, when analyzing the emergency exception, the facts must be "judged against an objective standard." Reynolds, 9 Va. App. at 437, 388 S.E.2d at 663 (citation omitted).

Because "the test is objective," the circumstances "as they appeared at the moment of entry" must be of a kind that would lead a "reasonable, experienced law enforcement officer" to believe that someone required immediate assistance. United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000) (citation & internal quotation marks omitted). It is "not a subjective test." State v. Hoth, 718 A.2d 28, 33 (Conn. App. Ct. 1998). "The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." Id.; see also State v. Carlson, 548 N.W.2d 138, 141-42 (Iowa 1996).

In this case, the ultimate question on appeal is whether the police officers articulated facts that — when viewed objectively — justify a warrantless entry pursuant to the emergency exception to the Fourth Amendment. The legally material facts, as the trial judge summarized them prior to ruling, established:

Because it has no impact on our legal analysis in this case, we need not pass judgment on this debate for purposes of deciding this appeal.

- In a 911 call to the police, the caller disclosed her street address from which the call was made.

- The caller reported hearing 10-12 gunshots coming from a neighbor's brick house across the street.

- The caller also reported that, after hearing the gunshots, she saw two males running out of the home and down the street.

- The officers went to the caller's home and then to a brick house across the street from the caller.

- The officers found at least one door open at the brick house.

- After the officers called into the house twice and received no reply, they entered and found a dead body on the floor.

Without once questioning the veracity of the officers' testimony, the trial judge agreed with Hopson's counsel that neither officer had "articulated anything" that would justify a warrantless entry into Hopson's house. Addressing this ultimate issue *de novo*, we hold the trial judge erred.

The "sound of gunfire in a house" (particularly a fusillade of 10-12 rounds) implies the possibility that someone has been shot — thus making it objectively reasonable for an officer to confirm or dispel that possibility. See Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.) (listing the "sound of gunfire in a house" as a circumstance excusing a warrantless entry). We would not only tolerate, but fully expect, police to respond to such an emergency. See United States v. Holloway, 290 F.3d 1331, 1339-41 (11th Cir. 2002) (holding that the emergency exception applies when an anonymous 911 caller reports gunfire and arguing coming from a residence); see also John F. Decker, Emergency Circumstances, Police Responses & Fourth Amendment Restrictions, 89 J. Crim. L. & Criminology 433, 481 (1999) (noting that a "report of gunfire in a residence should, of course, prompt immediate police inquiry").

We acknowledge Hopson's protest that the neighbor's report might not satisfy the probable cause standard. Even if true, however, this assertion misses the point.[8] In emergency exception cases, "the more stringent standard of probable cause is not required." State v. Portes, 840 A.2d 1131, 1136 (R.I. 2004); State v. Crawford, 659 N.W.2d 537, 543 (Iowa 2003) (noting that the standard governing emergency searches "is of course less than the probable-cause requirement applied in criminal searches"). If probable cause were required, "there would be no purpose for the emergency exception." People v. DePaula, 179 A.D.2d 424, 426 (N.Y. App. Div. 1992).

As a result, corroboration principles governing criminal investigations, like those addressed in Florida v. J.L., 529 U.S. 266 (2000), do not preclude police from making an emergency response to an anonymous 911 call reporting gunfire coming from a nearby residence. Holloway, 290 F.3d at 1338-39. "Many emergency searches arise from information provided by 911 callers." Id. at 1339 n.6. By law, 911 is the "universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance." 47 U.S.C. § 251(e)(3).

Given the irrelevance of probable cause, the emergency exception permits a reasonable officer to rely on "sometimes ambiguous information concerning potentially serious

---

[8] The neighbor making the call was not truly anonymous as Hopson claims. She gave the street address of her home from which the call was made. After dispatch reported the caller's address to Officers Wilson and Daniel, they responded directly to that address. The caller was later identified based entirely upon the information she provided. See State v. Alexander, 721 A.2d 275, 286 (Md. Ct. Spec. App. 1998) (approving house entry based on a call by a "presumptively reliable neighbor, who while wishing to remain anonymous nonetheless gave his house address"); City of Eastlake v. Pavlisin, 2002 Ohio 4702, ¶ 18 (Ohio Ct. App. 2002) ("The telephone informant provided identifying information including her address, and, therefore, was not anonymous to either the investigating officer or the dispatcher."); State v. English, 620 N.E.2d 125, 127 (Ohio Ct. App. 1993) (noting that an informant who provides the police with her address is not truly anonymous); State v. Williams, 623 N.W.2d 106, 114 (Wis. 2001) (observing that a caller providing her home address puts "her anonymity at risk" unlike the call in Florida v. J.L., 529 U.S. 266, 270 (2000), "from an unknown location by an unknown caller").

consequences." 3 Wayne R. LaFave, <u>Search & Seizure</u> § 6.6(a), at 452-53 (4th ed. 2004). As

Justice (then Judge) Burger put it, "the business of policemen and firemen is to act, not to

speculate or meditate on whether the report is correct. People could well die in emergencies if

police tried to act with the calm deliberation associated with the judicial process." <u>Wayne</u>, 318

F.2d at 212.

For similar reasons, we reject Hopson's assertion that our reasoning does not fully accord

with our recent holding in <u>Kyer</u>. Though we found the warrantless entry in <u>Kyer</u> violated the

Fourth Amendment, we made a point of emphasizing that no

> sounds or observations suggested panic or danger within the
> apartment. There were no reports from neighbors about any
> unique medical concerns or other vulnerabilities of the apartment's
> occupants. Nor did any of Kyer's neighbors report any suspicious
> circumstances suggesting foul play.

<u>Kyer</u>, 45 Va. App. at 481-82, 612 S.E.2d at 218. In contrast, here, a neighbor reported hearing

10-12 gunshots coming from a house across the street. That fact alone suggests an obvious

danger to anyone inside the house at the time of the shootings. It only enhances the objective

reasonableness of this risk assessment to add that the neighbor saw two males running out of the

house and down the street, that the police found one of Hopson's doors had been left open, and

that the police could not get a verbal response from anyone inside the house prior to entering it.[9]

---

[9] Hopson also moves to dismiss this appeal, arguing that we have no subject-matter jurisdiction because the Commonwealth's timely filed notice of appeal omitted the certification required by Code § 19.2-400. A later amended notice included the necessary certification. We hold the absence of the certification from a timely notice does not undermine our subject-matter jurisdiction. "As a general rule, insubstantial defects in a timely filed appeal 'should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court.'" <u>Christian v. Va. Dep't of Soc. Servs.</u>, 45 Va. App. 310, 315, 610 S.E.2d 870, 872 (2005) (citation omitted). By itself, the omission of a required certification should not be deemed a jurisdictional defect. <u>See</u> <u>M.G. v. Albemarle County Dep't of Soc. Servs.</u>, 41 Va. App. 170, 177-78, 583 S.E.2d 761, 764 (2003) (declining to hold "that Rule 5A:6(d)'s provisions regarding the contents of the accompanying certificate are jurisdictional"); <u>Riner v. Commonwealth</u>, 40 Va. App. 440, 454, 579 S.E.2d 671, 678 (2003) (holding that, as long as petition for appeal is

- 12 -

III.

The trial court erred in holding that the officers failed to articulate circumstances justifying the application of the emergency exception to the warrant requirement.  We reverse the trial court's suppression order and remand the matter for trial.

<u>Reversed and remanded.</u>

---

timely filed, "the provisions of Rule 5A:12(c) stating what the petition 'shall contain' . . . are not jurisdictional"), <u>aff'd</u>, 268 Va. 296, 601 S.E.2d 555 (2004).

Humphreys, J., concurring, in part, dissenting, in part, and dissenting from the judgment.

I concur in the majority's holding that this appeal is not procedurally defaulted under Rule 5A:3(a). However, because I believe that the majority has done little more than substitute its own inferences from the facts for those drawn by the trial court, I respectfully dissent from the majority's holding that the trial court was plainly wrong in finding that the officers failed to articulate enough facts to satisfy the requirements of the emergency doctrine. Based on the standard of review to which we are confined, and our recent holding in Kyer v. Commonwealth, 45 Va. App. 473, 612 S.E.2d 213 (2005) (en banc), I cannot join in the judgment to reverse and remand for trial. I would affirm the trial court's ruling granting the motion to suppress the evidence as the fruit of an unlawful entry conducted in violation of Hopson's Fourth Amendment rights.

I.

The majority recognizes, yet fails to apply, what it calls a "familiar standard of review" on appeal of a ruling granting a motion to suppress. In reviewing a trial court's ruling on a motion to suppress, "[w]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them . . . but we review *de novo* the trial court's application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case." Cherry v. Commonwealth, 44 Va. App. 347, 356, 605 S.E.2d 297, 299 (2004) (citations omitted). As we stated in Kyer,

> "[t]hough the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* scrutiny, we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449 (2003) (quoting Barkley v. Commonwealth, 39 Va. App. 682, 689-90, 576 S.E.2d 234, 237-38 (2003)). Thus, we must give "deference to the factual findings of the trial court" and "independently determine" whether those findings satisfy the requirements of the Fourth Amendment.

- 14 -

> Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463,
> 464 (2003).

Kyer, 45 Va. App. at 479, 612 S.E.2d at 216-17.

The standard of review in this case requires that we review the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to appellee, *the party prevailing below*. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991) (emphasis added). In this case, the prevailing party below was Hopson, and thus all findings of fact must be construed against the Commonwealth. So viewed, and in contrast to the facts as recited by the majority opinion, the evidence in this case establishes, at best, the following.

Officers Wilson and Daniel responded to a 911 call reporting multiple shots fired across the street from 2108 Victoria Boulevard. The location of the gunfire, aside from the mention of a brick home, was never clearly articulated. Neither officer knew with any certainty, based upon information received from dispatch, where, or if, the gunshots actually occurred. Wilson testified the dispatch indicated the caller "heard shots coming from the house at 2105." On the other hand, Daniel testified they "got a call for shots fired in the area of 2108 Victoria Boulevard and they said it was across the street where the house was." We should resolve this discrepancy, as the trial court implicitly did, and as the majority does not, against the Commonwealth.

When the officers arrived at the scene, they noticed there were two brick houses located directly across the street from number 2108, and the front door of one of the houses, numbered 2105, was standing open.[10] The officers testified that neither Officer Wilson nor Officer Daniel approached 2108 to ask the 911 caller to verify the reason for the call, clarify which home the shots were fired in or near, or describe the individuals that allegedly fled the scene. There were

---

[10] Officer Wilson testified he knew the interior door to the home was open. However, he did not remember whether the residence had a storm door, and if it did, whether it was open. Officer Daniel recalled both doors to the home being open.

no overt signs that shots had been fired in or near either home such as broken windows, bullet holes or spent shell casings. In fact, prior to the officers' entry into the home, the only physical indication that something unusual may have occurred at one of the two homes was the open door at 2105 Victoria Boulevard.

Acting on the report and the open door, the officers approached the front door of 2105 Victoria Boulevard and announced their presence. When they received no answer, Officer Daniel testified he "peeked" through the open door of Hopson's residence and saw various items in "disarray." On cross-examination, however, Officer Daniel could not provide details or specifics about any observed "disarray." As the majority suggests, in construing this testimony against the Commonwealth, the trial court as fact finder could have concluded either that the officer crossed the threshold of the residence, thereby implicating the Fourth Amendment and making any further observations legally irrelevant for purposes of assessing the legality of the entry, or that, whatever Officer Daniel saw, it was too insignificant to be recalled with any specificity, making the observations factually immaterial. However, under either scenario, the inability of the officers to articulate details of any "disarray" also arguably impacted negatively upon the credibility the trial court assigned to the officers as witnesses, and the weight the trial court gave their testimony.

II.

In arguing that the trial judge erroneously granted appellee's motion to suppress, the Commonwealth reasons that the trial court's implicit conclusion—that the officers could not have reasonably believed that a resident of number 2105 might be in need of emergency aid—is plainly wrong and without evidence to support it. And, because the officers reasonably believed that their actions might be necessary to obtain emergency care for a member of the public, the

Commonwealth concludes that the entry was justified pursuant to the community caretaker doctrine.[11]

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  Thus, as a general rule, "[a]bsent exigent circumstances, the threshold [of a dwelling] may not reasonably be crossed without a warrant."  Hill v. Commonwealth, 18 Va. App. 1, 3, 441 S.E.2d 50, 52 (1994) (citing Payton v. New York, 445 U.S. 573 (1980)).  Nevertheless, the Fourth Amendment only protects against "unreasonable" searches and seizures.  See Elkins v. United States, 364 U.S. 206, 222 (1960); Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985).  Accordingly, the United States Supreme Court has established various exceptions to the warrant requirement, see United States District Court, 407 U.S. at 318, two of which are pertinent here.

First, the "community caretaker doctrine" authorizes a warrantless search conducted pursuant to an officer's "community caretaking functions," as long as the search is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Cady v. Dombroski, 413 U.S. 433, 436-37, 441 (1973).  Second, according to the related "emergency doctrine," a warrantless entry into a private residence is valid if there is a "reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement

---

[11] The Commonwealth did not argue below that the exigent circumstances exception to the warrant requirement applied to this case.  On appeal, the Attorney General conceded that the Commonwealth is constrained to arguing the applicability of the community caretaker doctrine, and, therefore, we do not consider whether the officers had probable cause to enter the home based upon exigent circumstances.  Cf. Hill v. Commonwealth, 18 Va. App. 1, 441 S.E.2d 50 (1994) (affirming denial of motion to suppress where a neighbor telephoned the police and reported a possible burglary at a nearby residence, and, when the police arrived to investigate, the front door to the house was open, reasoning that the warrantless entry was permissible pursuant to the exigent circumstances exception because, under the totality of the circumstances, there was probable cause to believe a crime had been or was being committed).

functions." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992); see also Mincey v.

Arizona, 437 U.S. 385 (1978); Reynolds v. Commonwealth, 9 Va. App. 430, 436-37, 388 S.E.2d

659, 663-64 (1990). [12]  That is, because

> [t]he right of the police to enter and investigate in an emergency is
> inherent in the very nature of their duties as police officers[,] [a]
> warrantless search during an emergency situation is "justified, if
> not required, by the fact that 'the preservation of human life is
> paramount to the right of privacy protected by search and seizure
> laws and constitutional guaranties [sic].'"

Reynolds, 9 Va. App. at 437, 388 S.E.2d at 664 (quoting State v. Fisher, 686 P.2d 750, 761

(Wash. 1984)) (other citations omitted).

In Kyer, this Court recently held that, in order to invoke the emergency doctrine, an

officer must have a reasonable belief that "someone's health or safety is genuinely threatened."

Kyer, 45 Va. App. at 480, 612 S.E.2d at 217 (citing Reynolds, 9 Va. App. at 437, 388 S.E.2d at

664).  The majority opined that officers needed some "additional fact," other than an open door,

to justify a warrantless entry.[13]  Id. at 481-82, 612 S.E.2d at 218.  Thus, it is implicit that this

---

[12] See Kyer, 45 Va. App. at 490-91, 612 S.E.2d at 222 (Humphreys, J., concurring).
"Although the 'emergency doctrine' is often equated to the 'exigent circumstances' exception to
the warrant requirement, the two differ slightly." Id. at 489 n.6, 612 S.E.2d at 221 n.6. "When
officers conduct an emergency entry for purposes of investigating a crime, the emergency is
considered an 'exigency' for purposes of the exigent circumstances exception, and the officers
must have probable cause before they can enter the residence." Id. (citing Commonwealth v.
Thornton, 24 Va. App. 478, 484, 483 S.E.2d 487, 490 (1997) (recognizing that, "among the
circumstances accepted as providing 'exigent circumstances' for a warrantless search, are those
where a true 'emergency' exists")). "If, however, the officers effectuate an emergency entry for
a purpose *unrelated* to the investigation of a crime—for example, to provide emergency aid to an
injured resident—then the entry is valid as long as the officers had an objectively reasonable
belief that their help was needed." Id. (emphasis in original). "In this latter sense, the
emergency doctrine is functionally equivalent to, and sometimes deemed a subset of, the
community caretaker doctrine." Id.

[13] In Kyer, I would have affirmed based upon the existence of evidence to support the
trial court's factual finding that the wide open door of a residence at 4:00 a.m. in pouring rain
supported the reasonable inference drawn by the trial court in that case that a resident was in
need of emergency assistance.  The Kyer Court found such an inference insufficient as a matter

requirement of additional facts as actual evidence of injury or need for emergency assistance, would apply to the emergency doctrine.

During the pretrial hearing, and now on appeal, the Commonwealth argued that the entry was lawful pursuant to the community caretaker exception to the warrant requirement. However, it is clear that the justification advanced by the Commonwealth was actually based upon the closely related "emergency doctrine." Therefore, the question before this Court is whether the facts, when viewed in the light most favorable to Hopson, would result in a reasonable belief that someone inside 2105 Victoria Boulevard was in need of immediate medical aid.

Under the circumstances of this case, the trial court implicitly held that the officers' belief that "someone's health or safety [was] genuinely threatened," id. at 480, 612 S.E.2d at 217, was objectively unreasonable. The trial judge never specifically delineated his underlying rationale, merely noting that he based his ruling on the "reasons articulated by the defense counsel." Appellee listed the following reasons in support of his argument that the warrantless entry was not justified:

> [First], what we have is the officers' knowledge at the time that someone, who they don't know who it is, they don't know anything about the person's credibility, and they have no knowledge of how the person who called came about the information, . . . they have no evidence about how these people have called and said, shots were fired.
>
> [Second], they go up to a house. The other part of the dispatch is that it's across the street from 2108 and that it's a brick house. And we know that [there are] two brick houses across the street.
>
> [Third], . . . when the officer got out of his patrol car, he saw no evidence [which was testified to by both officers] . . . that shots had been fired. And he saw no evidence that a crime had been committed.

---

of law. Thus, any analysis of this case, including my own, is constrained by the <u>Kyer</u> precedent and the principle of *stare decisis*.

[Fourth], he walks up to 2105 and he says, one door is open, the other door he thinks is partially open because he stuck his head in and peeked in and he saw some things in disarray. Okay? He should have never looked in. He went too far when he did that. He didn't say, I walked up to the door and in plain view I saw something that led me to the next step . . . [b]ut he cannot articulate even one article that he saw in the living room that was in disarray. . . .

[Fifth], if on the way up to this house . . . the officer thought that there was some reason to believe . . . that someone was injured in the house, then there was no reason to peek your head in and look in the house. What you do is walk right in and try to help this person.

Thus, in concluding that the officers' belief was objectively unreasonable, it appears that the trial court relied upon the following factors: (1) that the officers never verified the accuracy of the 911 report with the caller; (2) that neither officer knew, based upon information received from the radio dispatch, where the gunshots actually occurred; and (3) that there were no other apparent signs a crime had been committed or that shots had been fired into the home, such as spent bullet casings, blood splatters, or outward signs of a struggle. It is also significant to note, as did the majority, that even though the trial judge never openly questioned the credibility of the officers' testimony, the trial judge did state the officers did not articulate "any facts" that would bring their conduct within the community caretaker doctrine. Based upon these facts, when construed against the Commonwealth, I would not find the trial court's conclusion to be "plainly wrong or without evidence to support [it]." Cherry, 44 Va. App. at 356, 605 S.E.2d at 299; see also Reynolds, 9 Va. App. at 437, 388 S.E.2d at 663 ("The reasonableness of a police officer's response in a given situation is a question of fact for the trial court and its ruling will not be disturbed on appeal absent clear and manifest error.").

The majority acknowledges that in Kyer we held that the discovery of an open door of a residence does not, in and of itself, give rise to a reasonable belief that someone inside is in need

- 20 -

of emergency aid.  Kyer, 45 Va. App. at 481-82, 612 S.E.2d at 218.  However, in distinguishing

Kyer, the majority states,

> [i]n contrast, here, a neighbor reported hearing 10-12 gunshots
> coming from a house across the street.  That fact alone suggests an
> obvious danger to anyone inside the house at the time of the
> shootings.  It only enhances the objective reasonableness of this
> risk assessment to add that the neighbor saw two males running out
> of the house and down the street, that the police found one of
> Hopson's doors had been left open, and that the police could not
> get a verbal response from anyone inside the house prior to
> entering it.[14]

Again, I disagree with the majority's substitution of its own factual inferences for that of

the trial court.[15]  The only fact beyond those present in Kyer relevant to our analysis, when

---

[14] In my view, the majority blurs the distinction between a reasonable suspicion approaching probable cause that the house was a crime scene, a legal issue not before us, and an objectively reasonable belief that someone in the house required medical or other emergency assistance.  The knowledge that two men were seen running from the house and the lack of response from anyone inside the house obviously supports the objectively reasonable proposition that the house was unoccupied at the time, and, therefore, contained no one requiring medical or other emergency assistance.

[15] The discussion in the majority opinion of what is or is not the "ultimate issue" in this case, while interesting and instructive, somewhat begs the question.  The crux of my difference with my colleagues in the majority not only revolves around the appropriate deference to be given the inferences drawn from the evidence by the fact finder, but also involves the manner in which the facts contained in this record are parsed by Fourth Amendment considerations.  The officers here were clearly investigating criminal activity involving the use of at least one firearm, and their actions may well have been constitutionally justified by the application of Fourth Amendment principles not raised or presented in the trial court.  However, the only justification advanced by the Commonwealth rests upon a constitutional requirement that sufficient facts be articulated that, in the context of this record, would lead any reasonable person to the inexorable conclusion that an occupant of this particular residence either required immediate medical assistance or was being held or threatened at gunpoint.

The trial court implicitly found that, the sound of gunfire and the open door, *when coupled with the lack of precision concerning which of two houses were the source of the gunfire, the lack of a verbal response or any sounds at all suggesting occupancy, and the lack of any other signs of a struggle or a crime,* would not lead to an inexorable conclusion that a hostage situation was in progress or immediate medical attention was required.  Notwithstanding the inferences others, including myself, might draw, I do not find it wholly unreasonable for the trial court to find that the evidence was insufficient to conclude that either circumstance existed.  Moreover, in the hypothetical event that nothing untoward had been discovered in the house searched here, the analysis of the majority would seem to likewise justify a subsequent

- 21 -

viewed in the light most favorable to Hopson, is the presence of gunfire in the area. As in Kyer, the residence searched in this case contained "no signs of forced entry—such as pry marks, mangled locks, broken hinges, or disfigured door jams." Id. at 481, 612 S.E.2d at 217. Similarly, "[n]o one called out for help," and "[n]o sounds or observations suggested panic or danger within the apartment." Id. at 481, 612 S.E.2d at 217-18. And, although one of Hopson's neighbors "report[ed] [] suspicious circumstances" that might "suggest[] foul play," that report failed to identify the specific property at which the "foul play" allegedly occurred. Id. at 481-82, 612 S.E.2d at 218. Also, there is no evidence, aside from the 911 call, that shots had, in fact, been fired. See State v. Davis, 497 N.W.2d 910, 922 (Mich. 1993) (finding that once the officers arrived at the scene, there was no evidence that shots had been fired or that someone was in need of immediate aid); cf. United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002) (finding that two 911 calls reporting gunfire, bullet casings on the ground and a picnic table, and a 870 Remington shotgun leaning against the mobile home, justified the officer's entry to determine if there was a victim in need of aid inside the residence).[16] For example, there were no bullet casings, no shattered windows, and no blood spatters on the ground. Thus, the 911 call provided no explicit report of anyone injured or in need of assistance nor was there any corroborating physical evidence suggesting that someone's health or safety was in danger inside the particular

warrantless search of the other brick home based upon a conclusion that someone must have needed help in one location or the other.

[16] The majority cites Holloway for the proposition that corroboration principles do not prevent police officers from investigating 911 calls because, under the emergency doctrine, probable cause is not required. This analysis presents two problems. First, this case is factually distinguishable. In Holloway, police officers responded to two 911 calls reporting gunfire and continuous fighting inside a residence. Holloway, 290 F.3d at 1332. Furthermore, when the officers arrived, there were bullet casings on the ground, the weapon was in sight, and one of the residents refused to comply with the officer's request to leave the porch with her hands raised above her head. Id. at 1332-33 Under these circumstances, the court found it was reasonable to believe that someone inside the residence might be in need of emergency aid. Second, according to Kyer, this Court has determined that the standard of "reasonable belief" approaches a probability standard for purposes of determining when the emergency doctrine will apply.

residence in question. Because the circumstances of this case are not significantly different from those presented in Kyer, I would hold that the trial court was not plainly wrong in finding that the officers could not have formulated an objectively reasonable belief that an individual in that particular residence might be injured or otherwise in need of aid.

CONCLUSION

I do not question that police officers may, in fact must, investigate when they receive a dispatch regarding shots fired in or near a dwelling. See, e.g., Davis, 497 N.W.2d at 922 (officers had the right to investigate a report of shots fired in a motel). However, unless and until the officers have a reasonable belief, based on facts and circumstances completely divorced from the criminal investigation, that an individual is in need of emergency medical aid, the officers are constrained by probable cause and may not enter the dwelling without it. Kyer, 45 Va. App. at 490, 612 S.E.2d at 222 (Humphreys, J. concurring) (citing Cady, 413 U.S. at 436-37).

In this case, the trial court implicitly found that the officers did not articulate sufficient facts that would give rise to a reasonable belief that someone in the home required medical or other type of emergency assistance. On the record in this case, and based upon the standard of review and the substantive law, I would affirm the trial court's decision to grant appellee's motion to suppress.